**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)**

**THE NATIONAL FEDERATION OF THE BLIND OF VIRGINIA,
Nacarlo Antonio Courtney, William Landrum Hajacos,
Michael McCann, Wilbert Green Rogers,
Kevin Muhammad Shabazz,
Patrick Shaw, and William Stravitz,**

      **Plaintiffs,**

**v.**                              **Case No. 3:23-cv-127**

**VIRGINIA DEPARTMENT OF CORRECTIONS; Harold Clarke, Director of the Virginia Department of Corrections, in his individual and official capacities; Barry Marano, ADA Coordinator of the Virginia Department of Corrections, in his individual and official capacities, Kevin Punturi, Acting Warden of Greensville Correctional Center, in his individual and official capacities; Darrell Miller, Warden of Deerfield Correctional Center, in his individual and official capacities; Tammy Williams, former Warden of Deerfield Correctional Center, in her individual capacity; Lane Talbott, ADA Coordinator of Greensville Correctional Center, in her individual and official capacities; Lakeisha Shaw, ADA Coordinator of Deerfield Correctional Center, in her individual and official capacities; Larry Edmonds, former Warden of Greensville Correctional Center, in his individual capacity; Officer D. Smith, in his individual capacity; Armor Correctional Health Services, Inc.; VitalCore Health Strategies; Vincent Gore, M.D., in his individual capacity; Alvin Harris, M.D., in his individual capacity, Nurse Cynthia Lester, in her individual capacity; Pranay Gupta, M.D., in his individual capacity; and Virginia Information Technologies Agency,**

      **Defendants.**

---

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, MANDAMUS AND
MONETARY RELIEF**

---

      The National Federation of the Blind of Virginia, Nacarlo Antonio Courtney, William Hajacos, Michael McCann, Wilbert Rogers, Kevin Muhammad Shabazz, Patrick Shaw, and William Stravitz, by and through counsel, hereby file this Complaint against the Virginia

Department of Corrections ("VDOC"); Harold Clarke, Director of VDOC; Barry Marano, ADA Coordinator of VDOC; Kevin Punturi, Acting Warden of Greensville Correctional Center ("Greensville"); Darrell Miller, Warden of Deerfield Correctional Center ("Deerfield"); Lane Talbott, ADA Coordinator at Greensville; Lakeisha Shaw, ADA Coordinator at Deerfield (collectively, with the preceding Defendants, "VDOC Defendants"); Larry Edmonds, former Warden of Greensville; Tammy Williams, former Warden of Deerfield; Armor Correctional Health Services, Inc. ("Armor"); VitalCore Health Strategies ("VitalCore"); Vincent Gore, M.D.; Alvin Harris, M.D.; Nurse Cynthia Lester; Pranay Gupta, M.D., Officer D. Smith, and the Virginia Information Technologies Agency ("VITA").

## INTRODUCTION

1.  Nacarlo Antonio Courtney, William Hajacos, Michael McCann, Wilbert Rogers, Kevin Muhammad Shabazz, Patrick Shaw, and William Stravitz (the "Individual Plaintiffs") are blind[1] men incarcerated in the custody of VDOC.

2.  Because they are blind, VDOC Defendants have denied the Individual Plaintiffs equal access to vital services, programs, and activities for which they are qualified, and which are available to nondisabled prisoners in the custody of VDOC.

3.  VDOC Defendants have refused to reasonably modify VDOC policies, procedures, and practices to accommodate the Individual Plaintiffs and other blind prisoners, have refused to provide auxiliary aids and services needed for blind prisoners to participate in VDOC services, programs, and activities, have provided blind prisoners ineffective accommodations and auxiliary aids and services, and have otherwise discriminated against them, with the result that the Individual

---

[1] We use blind in its broad sense, to include people with low-vision and other vision impairments that substantially limit their ability to see.

Plaintiffs and other blind prisoners have been and continue to be denied equal access to VDOC services, programs, and/or activities, including, but not limited to, education, work assignments, mail, law library, recreation, information (including, but not limited to, policies, procedures, postings, regulations, and forms), and events. In addition, VDOC Defendants routinely deny blind prisoners' requests for accommodations based on Dr. Gore's or another medical professional's determination that they are "not medically necessary," even though that is not the legal standard for granting or denying accommodations.

4.     VDOC and VDOC Defendants, as well as Armor and its employees and/or agents, VitalCore and its employees and/or agents, and Defendants Dr. Gupta Dr. Harris, and Nurse Lester denied and unreasonably delayed providing Mr. Stravitz necessary medical treatment for the condition that causes his blindness.

5.     VDOC and VDOC Defendants, as well as Armor Health Services, Inc. and its employees and/or agents, VitalCore Health Strategies and its employees and/or agents, and Defendant Dr. Gore, denied and unreasonably delayed providing Mr. Courtney necessary medical treatment for the medical condition that causes his blindness.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiffs' claims under the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the U.S. Constitution and 42 U.S.C. § 1983 for monetary damages and injunctive relief because those claims arise under federal law. 28 U.S.C. §§ 1331 and 1343.

7.     This Court has jurisdiction over Plaintiffs' Virginia Information Technology Access claim because it poses a substantial federal question regarding whether Defendants have complied with Section 508 of the Rehabilitation Act, 29 U.S.C. § 798.

8.      This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367 because the facts of the federal and state law claims form part of the same case or controversy.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as all of the events giving rise to the claims occurred in the Eastern District of Virginia.

## PARTIES

10.     Plaintiff Nacarlo Antonio Courtney is currently and at all times relevant to this suit has been a prisoner in the custody of VDOC.

11.     Mr. Courtney is currently housed at Greensville.

12.     During his confinement in the custody of VDOC, he has also been housed at Sussex I State Prison ("Sussex I"), Sussex II State Prison ("Sussex II"), Wallens Ridge State Prison, and Nottoway Correctional Center.

13.     Mr. Courtney has a vision impairment that substantially limits the major life activity of seeing.

14.     Mr. Courtney has a disability as that term is used in the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C. § 794.

15.     Mr. Courtney is 31 years old and became blind in prison. He was appointed to be the motivational speaker in his housing unit in 2022. He calls his wife and two children every weekend and he is looking forward to seeing them when he is released in 2023. He hopes to start studying to become a civil rights attorney.

16.     Plaintiff William Landrum Hajacos is currently and at all times relevant to this suit has been a prisoner in the custody of VDOC.

17.     Mr. Hajacos is currently housed at Greensville.

18.     During his confinement in the custody of VDOC, he has also been housed at Powhatan Correctional Center and Augusta Correctional Center.

19.     Mr. Hajacos has a vision impairment that substantially limits the major life activity of seeing. He also has a hearing impairment that substantially limits the major life activity of hearing.

20.     Mr. Hajacos has a disability as that term is used in the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C. § 794.

21.     Mr. Hajacos is 48 years old and is both blind and deaf. He loves soccer and hopes to take a graphic design course at Greensville when granted the appropriate accommodations.

22.     Plaintiff Michael McCann is currently and at all times relevant to this suit has been a prisoner in the custody of VDOC.

23.     Mr. McCann is currently housed at Deerfield and has been housed at Deerfield since the start of his confinement in the custody of VDOC.

24.     Mr. McCann has a vision impairment that substantially limits the major life activity of seeing.

25.     Mr. McCann has a disability as that term is used in the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C. § 794.

26.     Mr. McCann is 43 years old and has been blind since he was five years old. Mr. McCann, his mother, sister, brother, and sister-in-law, are longstanding members of the National Federation of the Blind. Mr. McCann hopes to take a horticultural course at Deerfield when he is granted the appropriate accommodations.

27.     Plaintiff Wilbert Green Rogers is currently and at all times relevant to this suit has been a prisoner in the custody of VDOC.

28.     Mr. Rogers has been housed at Greensville for the last eight months.

29.     During his confinement in the custody of VDOC, he has also been housed at Augusta Correctional Center, Deep Meadows Correctional Center, Red Onion State Prison, Sussex I, Lawrenceville Correctional Center, Green Rock Correctional Center, and Deerfield.

30.     Mr. Rogers has a vision impairment that substantially limits the major life activity of seeing.

31.     Mr. Rogers has a disability as that term is used in the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C. § 794.

32.     Mr. Rogers is 65 years old. After becoming partially blind in the late 1990s, he has been fully blind for the last 15 years. He learned Braille because another incarcerated blind person taught him, and recited positive quotes to others in his housing unit each morning when he served as his pod's mentor. His sisters, Brenda and Rita Rogers, are his caretakers at home and his support during incarceration.

33.     Plaintiff Kevin Muhammad Shabazz is currently and at all times relevant to this suit has been a prisoner in the custody of VDOC.

34.     Mr. Shabazz is currently housed at Deerfield and has been housed at Deerfield since the start of his confinement in the custody of VDOC.

35.     Mr. Shabazz has a vision impairment that substantially limits the major life activity of seeing.

36.     Mr. Shabazz has a disability as that term is used in the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C. § 794.

37.     Mr. Shabazz is 35 years old and has been blind since age 17. Mr. Shabazz likes being around people and reading nonfiction when he is able to use assistive technology. He is a father to two daughters who he keeps in touch with as often as he can.

38.     Plaintiff Patrick Shaw is currently and at all times relevant to this suit has been a prisoner in the custody of VDOC.

39.     Mr. Shaw is currently housed at Deerfield.

40.     During his confinement in the custody of VDOC, he has also been housed at Virginia State Prison, Greensville, and several other VDOC facilities.

41.     Mr. Shaw has a vision impairment that substantially limits the major life activity of seeing.

42.     Mr. Shaw has a disability as that term is used in the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C. § 794.

43.     Mr. Shaw is 60 years old and has been in VADOC custody for nearly 35 years. He experienced deteriorating vision for ten years before going completely blind in 2009. He is an honorably discharged army veteran who loves PBS, reading his Bible, calling his mother and sister, and—with the help of his caretaker—listening to rock music on his JP6 tablet, especially Radiohead.

44.     Plaintiff William Stravitz is currently and at all times relevant to this suit has been a prisoner in the custody of VDOC.

45.     Mr. Stravitz is currently housed at Deerfield.

46.     During his confinement in the custody of VDOC, he has also been housed at Greensville and Coffeewood Correctional Center.

47.     Mr. Stravitz has a vision impairment that substantially limits the major life activity of seeing.

48.     Mr. Stravitz has a disability as that term is used in the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C. § 794.

49.     Mr. Stravitz is 57 years old and has rapidly been losing his vision over the last two years. He graduated from the University of Richmond in 1987 with his bachelor's degree. He has spent several years as a tutor in VADOC custody helping other incarcerated people earn their GEDs, and now works in the prison library.

50.     Plaintiff National Federation of the Blind of Virginia ("NFB-VA") is a nonprofit membership organization.

51.     NFB-VA is made up of blind people of all ages, their families, and friends. Its members and leaders provide advocacy and support to blind and visually impaired Virginians across the state. NFB-VA works to promote full participation and integration of blind people in all areas of life and serves as an advocate for change when equal access and treatment of the blind is denied.

52.     NFB-VA's purpose includes ensuring that blind Virginians have full and equal access to all of the services, programs, and activities of the State.

53.     The interests that NFB-VA seeks to protect in this lawsuit are germane to that purpose.

54.     Mr. McCann, Mr. Shabazz, Mr. Shaw, and Mr. Stravitz are members of the NFB-VA.

55.  NFB-VA brings this case in a representative capacity on behalf of blind prisoners in the custody of VDOC and blind persons who may be placed in the custody of VDOC in the future.

56.  NFB-VA members Mr. McCann, Mr. Shabazz, Mr. Shaw, and Mr. Stravitz have standing to bring the claims described below in their own right.

57.  NFB-VA does not seek damages in this case on its own behalf or on behalf of its members, so neither the claims nor the requested relief require the participation of individual members in the lawsuit.

58.  Defendant Virginia Department of Corrections is a department of the Commonwealth of Virginia. VDOC has custody of the Individual Plaintiffs.

59.  VDOC receives federal financial assistance as that term is used in 29 U.S.C. § 794.

60.  Defendant Virginia Information Technologies Agency is an agency of the Commonwealth of Virginia. VITA shares the responsibility of procuring accessible technologies for Virginia's state prisons with VDOC.

61.   Defendant Harold Clarke, sued in his individual and official capacities, is the Director of VDOC. Director Clarke is responsible for ensuring that VDOC, its officials, and its agents do not violate the legal rights of prisoners in VDOC custody, as well as approving and implementing policies to ensure the same. Director Clarke is aware of the requirements of federal law, including the ADA, Section 504, and the Eighth Amendment to the United States Constitution as they pertain to the treatment of individuals incarcerated by VDOC.

62.  Defendant Barry Marano, sued in his individual and official capacities, is the ADA Coordinator for VDOC. Mr. Marano is responsible for VDOC's efforts to comply with Title II of the ADA and Section 504 at all correctional facilities in the Commonwealth of Virginia. This

includes ensuring that blind inmates have meaningful access to VDOC programs and services, as well as furnishing appropriate auxiliary aids and services and accommodations to inmates with disabilities. Mr. Marano is aware of the requirements of federal law, including the ADA and Section 504 as they pertain to the treatment of individuals in VDOC custody.

63.     Defendant Larry Edmonds, sued in his individual capacity, is the former Warden of Greensville. Warden Edmonds was responsible for ensuring that Greensville, its officials, and its agents did not violate the legal rights of prisoners in VDOC custody at Greensville. Warden Edmonds was aware of the requirements of federal law, including the Eighth Amendment to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at Greensville.

64.     Defendant Tammy Williams, sued in her individual capacity, is the former Warden of Deerfield Correctional Center. Warden Williams was responsible for ensuring that Deerfield, its officials, and its agents did not violate the legal rights of prisoners in VDOC custody at Deerfield. Warden Williams was aware of the requirements of federal law, including the Eighth Amendment to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at Deerfield.

65.     Defendant Kevin Punturi, sued in his official and individual capacities, is the Acting Warden of Greensville Correctional Center. Warden Punturi is responsible for ensuring that Greensville, its officials, and its agents did not violate the legal rights of prisoners in VDOC custody at Greensville. Warden Punturi is aware of the requirements of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at Greensville.

66.     Defendant Darrell Miller, sued in his individual and official capacities, is the Warden of Deerfield Correctional Center. Warden Miller is responsible for ensuring that Deerfield, it officials, and its agents do not violate the legal rights of prisoners in VDOC custody at Deerfield. Warden Miller is aware of the requirements of federal law, including the Eighth Amendment to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at Deerfield.

67.     Defendant Lane Talbott, sued in her individual and official capacities, is the ADA Coordinator at Greensville. Ms. Talbott is responsible for VDOC's efforts to comply with Title II of the ADA and Section 504 at Greensville. This includes ensuring that blind inmates have meaningful access to VDOC programs and services at Greensville, as well as furnishing appropriate auxiliary aids and services and accommodations to inmates with disabilities. Ms. Talbott is aware of the requirements of federal law, including the ADA and Section 504 and the Eighth and Fourteenth Amendments of the U.S. Constitution as they pertain to the treatment of individuals incarcerated at Greensville.

68.     Defendant Lakeisha Shaw, sued in her individual and official capacities, is the ADA Coordinator at Deerfield. Ms. Shaw is responsible for VDOC's efforts to comply with Title II of the ADA and Section 504 at Deerfield. This includes ensuring that blind inmates have meaningful access to VDOC programs and services at Deerfield, as well as furnishing appropriate auxiliary aids and services and accommodations to prisoners with disabilities. Ms. Shaw is aware of the requirements of federal law, including the ADA and Section 504 as they pertain to the treatment of individuals incarcerated at Deerfield.

69.     Defendant Armor Correctional Health Services, Inc. is a corporation organized under the laws of the State of Florida with its principal office in Miami, Florida, and with

operations in Virginia. In particular, Armor has operations in the Counties of Southampton and Greensville, Virginia at Deerfield, Greensville, and other locations in the Commonwealth. Armor's designated agent for service of process is located in Henrico County, Virginia. During Mr. Stravitz's detention at Deerfield and Mr. Courtney's detention at Sussex II and Greensville and continuing until on or about December 11, 2021, Armor had a contract with VDOC. By contract, Armor was responsible for providing on-site medical services to all prisoners at the VDOC's correctional facilities, including Mr. Stravitz at Deerfield and Mr. Courtney at Sussex II and Greensville. Armor was paid in excess of $72 million per year to provide healthcare services at VDOC facilities.

70.     Defendant VitalCore Health Strategies is a limited liability company doing business in, and in good standing with, the Commonwealth of Virginia. VitalCore's designated agent for service of process is located in Henrico County, Virginia. Since December 12, 2021, VitalCore has had a contract with VDOC. By contract, VitalCore is responsible for providing on-site medical services to all prisoners at the VDOC's correctional facilities, including Mr. Stravitz at Deerfield and Mr. Courtney at Greensville.

71.     Defendant Vincent Gore, M.D., is, and was at all relevant times, a physician licensed in the Commonwealth of Virginia. At all relevant times, Defendant Dr. Gore was an agent and/or employee of Armor and/or VitalCore. Under reasonable information and belief, at all relevant times, Defendant Dr. Gore was the Medical Director at Greensville. Defendant Dr. Gore was responsible for the medical care of Greensville prisoners, including Mr. Courtney. These responsibilities include authorizing referral requests for diagnostic studies and specialty care for prisoners at Greensville. Defendant Dr. Gore is also responsible for assessing and approving or denying prisoners' requests for accommodations. At all relevant times, Defendant Dr. Gore was

12

acting within the scope of his employment and/or agency with Armor and/or VitalCore under the color of state law.

72.    Defendant Alvin Harris, M.D., is, and was at all relevant times, a physician licensed in the Commonwealth of Virginia. At all relevant times, Defendant Dr. Harris was an agent and/or employee of Armor and/or VitalCore. Under reasonable information and belief, at all relevant times, Defendant Dr. Harris was the Medical Director at Deerfield. Defendant Dr. Harris was responsible for the medical care of Deerfield prisoners, including Mr. Stravitz. These responsibilities include authorizing referral requests for diagnostic studies and specialty care for prisoners at Deerfield. Defendant Dr. Harris is also responsible for assessing and approving or denying prisoners' requests for accommodations. At all relevant times, Defendant Dr. Harris was acting within the scope of his employment and/or agency with Armor or VitalCore under the color of state law.

73.    Defendant Pranay Gupta, M.D., is an ophthalmologist licensed in the Commonwealth of Virginia to whom medical professionals at Deerfield and Greensville refer prisoners for specialized eye care and with whom VDOC contracts to provide such care.

74.    Defendant Cynthia Lester is a registered nurse licensed in the Commonwealth of Virginia and is the nurse at Deerfield responsible for coordinating prisoner care, including scheduling appointments with Dr. Gupta to provide prisoners with specialized eye care.

75.    Officer D. Smith, sued in his individual capacity, is a corrections officer at Greensville.

## FACTS

**A.      Blind Prisoners Lack Equal Access to Written Materials and Information.**

76.      Title II of the ADA and Section 504 require covered entities to ensure that communication with people with disabilities is as effective as communication with people without disabilities. 28 C.F.R. § 35.160; 28 C.F.R. § 42.503(e)–(f).

77.      Sighted prisoners in the custody of VDOC receive information from VDOC in standard print that is not available in an accessible format, such as large print, taped text, accessible electronic format, or Braille. As used herein, "accessible electronic format" means a digital format that can be read aloud with screen reader (*i.e.*, text-to-speech) software and adjusted in font size, color, and brightness.

78.      VDOC and VITA have procured and maintained inaccessible technologies, including, but not limited to, JP6 tablets, kiosks, computers, and other devices that are not accessible to blind prisoners, including the Individual Plaintiffs.

79.      VDOC does not make screen reader software available to blind prisoners, including the Individual Plaintiffs. Screen reader software converts text on a computer screen to speech so that blind individuals can access what is written on the screen.

80.      VDOC makes orientation materials, facility handbooks, operating procedures, and other information available to prisoners in standard print.

81.      VDOC allows prisoners to keep copies of orientation materials, facility handbooks, operating procedures, and other information in their cells or lockers for independent review.

82.      VDOC does not make orientation materials, facility handbooks, operating procedures, and other information available in accessible formats.

83.      VDOC makes its commissary lists available to prisoners in standard print.

84. VDOC does not make its commissary lists available in accessible formats.

85. VDOC provides prisoners with a Scantron bubble sheet to complete their commissary orders.

86. VDOC does not make its commissary order forms available in accessible formats.

87. VDOC makes the menu of food available at mealtimes available in standard print.

88. VDOC does not make the menu of food available at mealtimes available in accessible formats.

89. VDOC communicates with prisoners in print through, among other documents, memoranda, directives, facility publications, commissary lists, and menus. This information is provided in standard print.

90. VDOC posts hard copies of informational postings, including updates to schedules, recreation, commissary, job postings, and changes to policy in standard print.

91. VDOC does not make memoranda, directives, facility publications, menus, commissary lists, or posted information available in accessible formats.

92. Greensville provides information to prisoners using the "titler" system, which displays written, electronic messages concerning facility events, fire drills, outside recreation, commissary, chow, and other information through printed text broadcast on television sets in common areas.

93. Messages on the titler system are not broadcast in an accessible format.

94. In order for a prisoner to receive a message broadcast on the titler system they must be able to see and read the message.

95. None of the Individual Plaintiffs housed at Greensville has independent access to the titler system.

96.     As a result, the Individual Plaintiffs at Greensville are often unaware of messages broadcast on the titler system.

97.     Blind prisoners, including the Individual Plaintiffs, do not have equally independent and effective access to orientation materials, facility handbooks, operating procedures, memoranda, directives, facility publications, menus, commissary lists, the titler system, or posted written information as sighted prisoners.

98.     VDOC's grievance program requires prisoners to fill out a printed form in writing and provides responses to prisoners in writing. VDOC does not provide grievance forms in alternative formats.

99.     There is no way for a blind prisoner to independently or privately fill in and submit a grievance form.

100.    There is no way for a blind prisoner to independently or privately read VDOC's responses to their grievances.

101.    Prisoners are expected to request appointments with health care professionals to address a medical concern by submitting requests in writing.

102.    Blind prisoners, including the Individual Plaintiffs, are unable to independently or privately write requests for medical visits.

103.    When submitting a person for inclusion on their visitor list, prisoners must provide the visitor's name, address, and relationship in writing.

104.    There is no accessible way for blind prisoners, including the Individual Plaintiffs, to independently or privately submit names and phone numbers for inclusion on their visitor list.

105.    When a blind prisoner, including the Individual Plaintiffs, is forced to rely on a Caregiver or other prisoner to submit the required information about prospective visitors, this gives

those prisoners access to the names, addresses, and relationships of people on the blind prisoner's visitor list.

106. In the absence of accessible versions of the materials and programs described in paragraphs 77 through 105 above, VDOC sometimes assigns other prisoners, called "Caregivers," to blind prisoners, including the Individual Plaintiffs, to read and write for them.

107. When blind prisoners are not assigned a Caregiver, or when a Caregiver is not available or not willing to assist them, they must rely on other prisoners to read and write for them. Sometimes, they must pay other prisoners to read and write for them.

108. Caregivers are also tasked with guiding blind prisoners, including the Individual Plaintiffs, from place to place within their facility.

109. Caregivers are other prisoners in VDOC custody.

110. Caregivers are not qualified to act as readers or scribes and receive no training before assuming their roles as Caregivers.

111. The need to rely on Caregivers and other prisoners for reading and writing compromises the security and privacy of blind prisoners, including the Individual Plaintiffs.

112. Reading and writing grievance forms, medical request forms, and other written communications with VDOC staff and offices gives Caregivers and other prisoners access to private medical information and other private, personal, and/or confidential information.

113. Relying on Caregivers and other prisoners puts blind prisoners, including the Individual Plaintiffs, at the mercy of the Caregiver's or other prisoner's literacy skills, ethical principles, work ethic, and self-interest, and leaves them uninformed concerning facility events and policies.

114.    Limitations in various Caregivers' and other prisoners' reading and writing skills have led to misunderstandings of the Individual Plaintiffs' grievances with the result, in some cases, that grievances have been denied.

115.    VDOC provides no way for a blind prisoner to independently or privately read and write their own mail.

116.    Blind prisoners, including the Individual Plaintiffs, are unable to independently or privately read and write their own mail.

117.    Sighted prisoners read almost all of Mr. Courtney's, Mr. Hajacos's, Mr. McCann's, Mr. Rogers', Mr. Shabazz's, and Mr. Shaw's incoming mail, including personal and legal mail, which gives these prisoners access to private information about both the Individual Plaintiffs and their family members, including, for example, their names, genders, ages, and addresses, as well as privileged discussions with their criminal and civil attorneys.

118.    To read his incoming mail, Mr. Stravitz must be in dim light, wear prescription glasses, use a booklight, and hold the document approximately an inch from his face. If Mr. Stravitz's vision continues to deteriorate, he will soon need to rely on a Caregiver or other prisoners to read his incoming mail, including personal and legal mail, which will give those prisoners access to private information about both Mr. Stravitz and his family members including, for example, their names, genders, ages, and addresses, as well as privileged discussions with his criminal and civil attorneys.

119.    Fellow prisoners write nearly all of Mr. Courtney's, Mr. McCann's, Mr. Rogers', Mr. Shabazz's, and Mr. Shaw's outgoing correspondence, giving those prisoners access to personal and confidential information, about both them and their family members, and putting

them at the mercy of the prisoners' handwriting, grammar, spelling, and punctuation skills or lack thereof.

120.    To write his outgoing mail, Mr. Stravitz uses a booklight (that he purchased himself from the commissary) and a thick-tipped magic marker with dark ink so that he can see the words on the page.

121.    When a blind prisoner, including the Individual Plaintiffs, does not have an assigned Caregiver, or when a Caregiver is unavailable or unwilling, the blind prisoner is forced to rely on whomever in his pod is most trustworthy.

122.    After repeatedly requesting a Caregiver, Greensville finally assigned one to Mr. Rogers in July 2022. About a month later, however, VDOC transferred Mr. Rogers' Caregiver to a different prison. Since then, Greensville has not assigned Mr. Rogers a new Caregiver, despite multiple requests. Instead, Mr. Rogers pays different people in his pod in commissary goods to help him navigate the prison, fill out commissary bubble sheets and other forms, read and write documents and correspondence for him, and take care of other daily needs.

123.    Mr. Hajacos often pays other inmates with items from the commissary to have them read and write documents for him. This requires him to reveal personal and/or confidential information to his fellow inmates.

124.    Mr. McCann missed the deadlines for two of his grievances because of his Caregiver. Additionally, he once tried to complete a grievance form himself using a Sharpie marker and writing in large print. Because the print was so large, he had to attach a separate sheet of paper to detail his grievance. VDOC rejected his grievance because he attached the second sheet of paper and did not limit his grievance to the confines of the box on the grievance form.

125.    Multiple times, Mr. Shabazz has been unable to submit grievances because he had to rely on other prisoners to read the forms and complete them for him.

126.    The lack of accessible written information—and the need to rely on Caregivers and other prisoners—denies blind prisoners, including the Individual Plaintiffs, access not only to the information itself, but often to medical care, grievance programs, and other programs described in the written documents.

127.    Upon information and belief, VDOC provides computers in the law libraries of Deerfield and Greensville and provides legal research and other information and software on those computers for prisoner use.

128.    Upon information and belief, the computers in the law libraries of Deerfield and Greensville do not have screen reader software on them.

129.    Greensville does not provide a scanner, printer, or other assistive technology to allow blind prisoners to access documents on the library computers. Blind prisoners at Greensville, including Mr. Courtney, Mr. Hajacos, and Mr. Rogers, are limited in the amount of time they can spend in the library: about two hours per visit. Because there is no assistive technology to aid in their work, they struggle to get much done while they have that time in the library.

130.    Deerfield has only one SARA scanner that prisoners can access, and only with prior approval and for a limited amount of time. A SARA scanner converts printed text into spoken text. The SARA scanner is located in the law library, and prisoners may only request to use the scanner when the law library is open to access all print materials, not only materials in the law library.

131.    Because of their schedules, blind prisoners, including Individual Plaintiffs, are not always able to get to the law library during the week to use the SARA scanner for their legal and personal needs. For example, Mr. Shabazz is allowed to use the SARA scanner for one hour on

Saturday and one hour on Sunday, but he has to submit a request every week to receive one additional hour during the week. In addition, the request form is not in an accessible format.

132.    Deerfield does not provide assistive technology to allow blind prisoners to access documents on the library computers.

**B.    Blind Prisoners Lack Equal Access to Educational and Vocational Programs.**

133.    VDOC offers educational and vocational programming to prisoners in its custody.

134.    Blind prisoners are not afforded access equal to that of sighted prisoners to available educational and vocational programs.

135.    VDOC fails to provide information concerning educational and vocational programs in accessible formats.

136.    VDOC fails to provide the materials used in educational and vocational programs, such as worksheets, textbooks, computer programs, and other tools in accessible formats.

137.    Mr. Courtney is enrolled in college courses, but VDOC has failed to provide materials to him in an accessible format and/or provide him with a qualified reader. VDOC has also failed to provide Mr. Courtney with extra time to complete his assignments and tests.

138.    Mr. Shabazz has been enrolled in a computer course at Deerfield since April 2022, but VDOC does not have the appropriate software to make the course accessible to him. Upon information and belief, VDOC installed a trial version of speech-to-text software for Mr. Shabazz to use that places limits on the amount of time Mr. Shabazz can use the software.

139.    Mr. Shabazz is also enrolled in a GED course at Deerfield. To access the course materials, VDOC has assigned a fellow prisoner to read the materials to Mr. Shabazz. However, the fellow prisoner cannot "read" the graphs and other images included in the GED materials, so Mr. Shabazz has no way to access those materials.

140.    Mr. Hajacos is enrolled in a computer class at Greensville. To access the print textbook, Mr. Hajacos has to ask fellow prisoners in his class to read it to him. Neither VDOC nor Greensville has assigned a reader to Mr. Hajacos, and none of the prisoners in his computer course are qualified readers as required by the ADA.

141.    Mr. McCann attempted to attend a horticulture class at Deerfield, but the instructor did not know how to instruct Mr. McCann and Deerfield would not allow his Caregiver to attend the classes with him. As a result, Mr. McCann dropped out of the class.

142.    Approximately four years ago, Mr. Shaw was accepted into a computer class at Deerfield, but his Caregiver was not allowed to attend with him. Offering an alternative, Mr. Shaw asked if his Caregiver could sit outside the classroom while he was inside learning in case he needed to use the restroom or needed other assistance. The instructor refused. As a result, Mr. Shaw was forced to withdraw from the class.

**C.    Blind Prisoners Lack Equal Access to Work Assignments.**

143.    VDOC offers work assignments and vocational programming to prisoners in its custody.

144.    Blind prisoners are not afforded access equal to that of sighted prisoners to available work assignments or vocational programs.

145.    All eligible prisoners in custody of VDOC are expected to work and/or participate in a VDOC-approved education or training program. VDOC Operational Procedure 841.2, Offender Work Programs, § I.D.

146.    VDOC makes a variety of work assignments available at various rates of pay.

147.    Grade 1 work assignments pay 27¢ an hour. They are considered "unskilled" work assignments. *Id.* § III.6(a).

148.    Grade 2 work assignments pay 35¢ an hour. They are considered "semi-skilled" work assignments. *Id.* § III.6(b).

149.    Grade 3 work assignments pay 45¢ an hour. They are considered "skilled" work assignments. *Id.* § III.6(c).

150.    Each facility's Orientation Manual contains information on jobs available at the facility and the process for obtaining jobs, *id.* § I.F, but VDOC does not provide the Orientation Manuals in an accessible format.

151.    Job descriptions are made available in printed format but not an accessible format, making it difficult for blind prisoners, including the Individual Plaintiffs, to learn about work assignments much less request accommodations for those opportunities.

152.    On information and belief, blind prisoners are unable to obtain Grade 3 work assignments, and are often relegated to Grade 1 "unskilled" work assignments or receive no work assignment because they are blind. If a prisoner has a work assignment and then loses his vision, VDOC terminates the work assignment.

153.    Mr. McCann requested a job and was assigned to fill the hot water pot for the other prisoners in his pod so that they could prepare food and drinks—a Grade 1 work assignment. But the lieutenant assigned to his pod would not let him perform the work because he believed it was "too dangerous." Mr. McCann's supervisor, Lieutenant Vann, even asked, "How's a blind guy supposed to do this?"

154.    Mr. McCann is considered ineligible for certain work assignments because of his blindness, including cleaning bathrooms, operating the floor buffer, and working in the kitchen.

155.    Three years ago, Mr. McCann requested a work assignment, and VDOC gave him the position of "Assistant to the ADA Coordinator." However, Mr. McCann does not do anything

in this position. Deerfield claims that new blind prisoners have not requested Mr. McCann's assistance, but Deerfield does not appear to inform them that Mr. McCann is available to assist them. Deerfield recently changed Mr. McCann's job title to "Counselor's Aide," but his job duties have not changed.

156.    For about four years, Mr. Shabazz has been assigned to do his pod's laundry—a Grade 2 work assignment. Mr. Shabazz would like a Grade 3 work assignment, but VDOC will not give him one because VDOC says that his blindness poses a safety risk. However, VDOC refuses to provide Mr. Shabazz with the occupational therapy, including cooking, cleaning, and blindness skills he needs to have a Grade 3 work assignment.

157.    Mr. Shabazz has submitted applications for Grade 3 work assignments, including "pod clerk" and main laundry, but the supervisor of his pod refuses to consider his applications.

158.    Since 2007, VDOC has not permitted Mr. Shaw to have a work assignment. He would like to have a work assignment, but VDOC refuses to provide him with the occupational therapy, including computer training, and blindness skills he needs to have a work assignment.

159.    Mr. Stravitz was a tutor for a GED course, but the instructor left, and he was transferred to a position in the law library.

160.    Over the past two months, Mr. Stravitz's vision has progressively worsened such that he cannot see computer screens anymore due to the white glare and he now has very poor depth perception.

161.    Mr. Stravitz is concerned that he will become less valuable as a library employee as the limitations on his vision increase,  and without assistive technology in the library, which VDOC has failed to provide, he will be terminated. Mr. Stravitz has cause for concern because his supervisor has expressed to him that she "can't believe I hired a blind guy."

162.    From January to May 2019, Mr. Courtney was a "prisoner advisor," who read charges to prisoners, but VDOC removed him from this position because of his vision loss. Since then, Mr. Courtney has not had a work assignment even though he would like one.

163.    Mr. Hajacos began working in a woodshop job in early 2020. In his role, Mr. Hajacos made 62¢ per hour with the opportunity for wage increases every six months. In May 2020, the woodshop closed down because of a COVID-19 outbreak at Greensville. Greensville reopened the woodshop in June 2020, but Greensville officials required all the woodshop employees to move into two pods—pods in which Mr. Hajacos did not reside and which were not designed to accommodate individuals with disabilities. Mr. Hajacos was informed that, if he moved pods to keep his job, he would lose all of the accommodations he had in his current housing unit. But, if he stayed in his current pod, he would lose his job. Mr. Hajacos stayed in his pod with his accommodations and has not been able to find work at his previous rate of pay since then.

**D.    Failure to Provide Reasonable Accommodations to Blind Prisoners.**

164.    The ADA and Section 504 require covered entities to make reasonable modifications in policies, practices, and procedures when the modifications are necessary to avoid discrimination. 28 C.F.R. § 35.130(b)(7); *Se. Cmty. College v. Davis*, 442 U.S. 397, 412–13 (1979).

165.    VDOC Defendants have failed and continue to fail to provide necessary reasonable modifications of policies, practices, and procedures to accommodate blind prisoners, including the Individual Plaintiffs.

**1.    Nacarlo Courtney**

166.    In September 2019, Dr. Linda Pinsky, O.D., from Virginia Commonwealth University ("VCU") submitted a letter to VDOC explaining Mr. Courtney's medical condition and

25

necessary accommodations, stating, "[s]ince Mr. Courtney is unable to wear his contacts all of the day, he should have accommodations for his extremely poor vision. The patient needs dimmer indirect lighting. Bright light like fluorescent light distorts his poor vision."

167.    When Dr. Pinsky submitted her letter, Mr. Courtney was housed at Sussex II. Although Mr. Courtney had to file several requests for accommodations and written grievances, officials at Sussex II ultimately provided him with dimmer light bulbs and permitted him to cover his window to block out the sunlight, which irritates his eyes.

168.    In October 2020, Dr. Pinsky submitted a second letter to VDOC explaining that, because of Mr. Courtney's keratoconus, he needs items in an enlarged format so that he can see clearly without straining his eyes, including the largest television VDOC permitted at the time. Therefore, Mr. Courtney requested a seven-inch tablet and a larger (15-inch) television (that he would have to pay for himself). Sussex II officials approved Mr. Courtney's request.

169.    When VDOC moved Mr. Courtney to Greensville in November 2021, Greensville officials took away all the accommodations that Sussex II had provided to Mr. Courtney, including dimmer lights and the ability to cover the window in his cell.

170.    Mr. Courtney's VDOC medical transfer documentation notes that his keratoconus is a "current medical problem requiring attention," as well as his prescription for sodium chloride solution that Mr. Courtney uses to insert his contacts into his eyes.

171.    After his transfer to Greensville, Mr. Courtney struggled to receive the medical treatment he needed for his keratoconus, submitting multiple requests to see the eye specialists at VCU to no avail.

172.    In May 2022, because his eyesight had deteriorated, and his eyes were swollen and painful, Mr. Courtney was ultimately transferred to the Greensville infirmary "for his own safety."

173.    On May 20, 2022, even though his condition had not improved, Assistant Warden Putney transferred Mr. Courtney out of the infirmary.

174.    Between May and July 2022, Mr. Courtney submitted multiple requests for accommodations and medical treatment, as well as grievances regarding Greensville's failure to provide him with accommodations and necessary medical treatment for his keratoconus.

175.    On July 21, 2022, Mr. Courtney met with Defendants Marano and Talbott to discuss the lack of medical treatment for his keratoconus and his requests for reasonable accommodations.

176.    On July 25, 2022, Mr. Courtney submitted a letter to Defendant Talbott summarizing the history of his keratoconus and ADA accommodations. The letter indicates that Defendant Marano informed Mr. Courtney that accommodations would be approved for him, and he formally requested sunglasses, a maximum-size television, wireless headphones, and a Blu-Ray DVD player.

177.    On August 3, 2022, Defendant Talbott responded to Mr. Courtney's letter, stating that it was "[r]eceived [and] sent to medical for approval."

178.    In August and September 2022, Mr. Courtney submitted requests for accommodations and written complaints requesting tinting the window and dimming the lights in his cell, a larger television, and sunglasses to protect his eyes from bright light. Even though Dr. Pinsky had submitted a letter to VDOC regarding Mr. Courtney's eye condition and his required accommodations, Defendant Talbott routed all Mr. Courtney's requests to Medical for approval. Mr. Courtney received no responses.

179.    Greensville still has not provided Mr. Courtney with his reasonable accommodations, including window and light tinting, sunglasses, a large screen television, wireless headphones, or a Blu-Ray DVD player.

180.    In one incident in September 2022, maintenance workers came to install window tinting in Mr. Courtney's cell on orders from the then-warden. However, the lieutenant in charge of Mr. Courtney's pod, Lieutenant Joyner, ordered them to stop, and the maintenance workers left Mr. Courtney's cell without tinting his windows.

181.    In the fall of 2022, Mr. Courtney was moved into the reentry pod at Greensville. Because VDOC has failed to accommodate him or provide accessible format materials, he has been unable to participate in any reentry programming.

182.    Mr. Courtney has also been forced to block the light from his window himself. As a result, corrections officers at Greensville regularly threaten to write him up for covering the window, notwithstanding the fact that his letter from Dr. Pinsky states that such an accommodation is necessary for his keratoconus.

### 2.    Michael McCann

183.    Mr. McCann is assigned a Caregiver who assists him with tasks, including reading, writing, and navigating around Deerfield.

184.    Mr. McCann's Caregiver is assigned to a bed on the opposite side of Mr. McCann's housing unit, which requires Mr. McCann to attempt to navigate through the object-strewn aisles when he needs assistance.

185.    Mr. McCann filed a request for accommodations to have his Caregiver moved to the bed next to him. Defendant Shaw denied his request, claiming that it is "not medically necessary" and that there must be verification that his vision has worsened to move his Caregiver to the bed next to him.

186.    When Mr. McCann does not have the assistance of his Caregiver to navigate Deerfield, he has accidentally bumped into corrections officers and other prisoners, sometimes leading to physical altercations that have resulted in physical injuries to Mr. McCann.

187.    In 2017 or 2018, a fellow prisoner assaulted Mr. McCann. Mr. McCann reported the assault to Deerfield officials, but they refused to review surveillance video of the incident because Mr. McCann could not identify his assailant—something he could not do because he is blind.

188.    Other prisoners and corrections officers have taken advantage of Mr. McCann because of his disability by stealing his personal property, including, but not limited to, coffee, shorts, a baseball cap, and many commissary items.

189.    Before the COVID-19 pandemic, VDOC permitted Mr. McCann's Caregiver to go with him to the recreation area at Deerfield and walk with him. Since approximately March 2020, however, Deerfield officials have forced Mr. McCann to navigate to and around the recreation area without his Caregiver and have limited him to walking back and forth on the basketball court while other prisoners are playing basketball to get exercise. On several occasions, Mr. McCann has been hit by a basketball while exercising on the basketball court.

190.    About five years ago, Mr. McCann received a magnifier from the Virginia Department of the Blind and Visually Impaired ("VDBVI"), but because his vision has continued to deteriorate, it is no longer strong enough to be an effective auxiliary aid.

191.    Mr. McCann requested a new magnifier, but Deerfield officials denied his request. Even if they had approved it, Mr. McCann would be required to purchase the magnifier with his own money.

192.     VDBVI also gave Mr. McCann a Sharpie marker to use for writing large print. When the Sharpie marker ran out of ink, it took VDOC four months to provide him with a new one and he had to purchase it with his own money.

193.     Deerfield provided Mr. McCann with prescription glasses, but they are the wrong prescription. Mr. McCann has requested that Deerfield officials provide him with new glasses with the correct prescription, but they have failed to do so.

### 3.     William Hajacos

194.     Mr. Hajacos is housed in the ADA pod at Greensville, which, as discussed above, uses the titler system, an electronic message board, to announce when it is chow time, rec time, or when other important events are happening. Greensville also sometimes uses a speaker to announce when it is chow time, rec time, or when other important events are happening.

195.     Because Mr. Hajacos is deaf and he cannot see the titler message board, Greensville corrections officers are supposed to shake the door on his cell to let him know that it is chow time, rec time, or that another important event is happening.

196.     Mr. Hajacos has missed chow time on several occasions because he cannot see the screen in his pod that announces when it is chow time, he cannot hear the announcements for chow time because he is deaf, and Greensville corrections officers fail to or refuse to shake his cell door to notify him that it is chow time.

197.     Greensville corrections officers are also supposed to shake Mr. Hajacos's cell door when he has medical, legal, or other appointments.

198.     Mr. Hajacos has missed multiple appointments, including medical appointments, because Greensville corrections officers either fail to or refuse to shake his cell door, or otherwise notify him of his appointments.

199.    In addition, Mr. Hajacos has requested several accommodations, including a larger TV, a magnifier or magnifying glasses, an external keyboard for his JP6 tablet, and a reading light, none of which he has received.

## E.    Housing Accommodations

### 1.    Deerfield

200.    Deerfield has housing units with dorm-style living, meaning the beds for approximately 100 prisoners are arranged in a grid pattern on the floor with aisles between the prisoners' beds.

201.    Deerfield's dorm-style housing also has communal showers.

202.    Deerfield has an Assisted Living Unit that also has a dorm-style layout, but with only about forty-seven prisoners in the Unit.

203.    Deerfield has single cells in which it could house blind prisoners—one with a shower in it and the others with access to single stall showers—but it is instead using them for storage.

204.    Because of the dorm-style layout of the housing units, there are frequently items partially or fully obstructing the aisles. These obstructions pose a trip hazard to blind prisoners and have, in fact, caused blind prisoners, including Individual Plaintiffs, to trip and injure themselves.

205.    Mr. McCann stopped taking showers for a period of time because a fellow prisoner would masturbate while Mr. McCann was taking a shower, thinking Mr. McCann could not see him.

206.    Mr. Shaw lived in one of Deerfield's single cells for about five years until prison staff converted the cells into storage. He was then forced to move into the dorm-style pod with the general population.

207.   Because of the communal showers in the dorm-style pod, Mr. Shaw must have his Caregiver assist him when he takes a shower.

208.   During the height of the COVID-19 pandemic, Mr. Shaw was separated from his Caregiver, and he was forced to pay other prisoners to take him to the shower.

209.   If Mr. Shaw had access to his own shower or a single stall, he would be able to privately and independently shower.

## 2.    Greensville

210.   Greensville has what is called an "ADA pod," in which all prisoners with disabilities, including blind inmates, are housed.

211.   Because Mr. Rogers is completely blind and uses a white cane to navigate, Medical at Greensville has previously issued him single-cell orders, meaning that Mr. Rogers needed to be housed in a single cell without a cellmate.

212.   Such orders are typically issued for blind prisoners because being familiar with their surroundings is essential to navigating safely. Cellmates have their own property, which they may move. Blind prisoners also have their own property, which their cellmates may move, or even steal. Both scenarios pose tripping and other hazards to the blind prisoner that are avoided by housing the blind prisoner in a single cell.

213.   During a previous period of incarceration that ended in 2013, Mr. Rogers had a single-cell order. At Green Rock, officials in the medical unit refused to renew Mr. Rogers' single-cell order, telling him that he has to be an amputee or have a seizure disorder to get a single cell. Mr. Rogers was subsequently transferred to Deerfield, and then Greensville. He requested single-cell status at each institution, but was denied a single cell at both.

214. For his first few months at Greensville, Mr. Rogers had a cellmate who would move Mr. Rogers' property around, meaning Mr. Rogers often could not locate his belongings when he needed them. Mr. Rogers submitted a request for a single cell to Defendant Talbott, but never received a response.

215. In the fall of 2022, Mr. Rogers' cellmate was moved into isolation and his appointed Caregiver was allowed to move into the cell with him. But, within just a few weeks, his Caregiver was transferred to another facility. He now lives alone in his cell, but Greensville officials have told him that he will soon be moved into a cell with another prisoner.

**F.    Failure to Provide Medically Necessary Treatment to Blind Prisoners.**

**1.    Nacarlo Courtney**

216. In 2016, while housed at Sussex I, Mr. Courtney was diagnosed with keratoconus, which causes his corneas to thin and bulge into a cone shape, resulting in the loss of his vision and sensitivity to light.

217. Initially, Mr. Courtney's corrected vision was 20/40 in his right eye and 20/25 in his left eye. He was prescribed contacts to correct his vision, and he received an evaluation every six months and was fitted for new pairs of contact lenses as his vision worsened.

218. In 2017 or 2018, Mr. Courtney was screened for eligibility for corneal cross-linking therapy.

219.  By 2019, Mr. Courtney's vision had substantially worsened to 20/200 in his right eye and 20/100 in his left eye.

220. On February 13, 2020, Mr. Courtney submitted an informal complaint to correctional officials at Sussex II, seeking access to medical care and new contacts, which had been delayed over two months.

221.   Mr. Courtney was not seen by a medical provider until June 23, 2020, when he finally saw Dr. Pinsky, who noted that he has keratoconus that is "unstable" in both eyes and that his contact lenses needed "a change in power and a change in edge design."

222.   In September 2020, Mr. Courtney received a new right contact lens, but not a new left one.

223.   In July or August 2021, Mr. Courtney's right contact lens broke. He submitted requests around that time for a medical appointment and new contacts, neither of which were timely provided.

224.   On September 26, 2021, Mr. Courtney submitted a Written Complaint to corrections officials at Sussex II regarding a medical appointment and new contacts.

225.   Sussex II officials never sent Mr. Courtney to see a doctor, to have a new consult for his keratoconus, or to replace Mr. Courtney's broken right contact lens.

226.   In November 2021, VDOC moved Mr. Courtney to Greensville.

227.   On November 30, 2021, a medical provider in the Greensville infirmary noted that Mr. Courtney requires 0.9% sodium chloride solution to insert his contact lenses and contact lens solution to clean his contacts typically once daily.

228.   On December 22, 2021, the medical provider in the Greensville infirmary referred Mr. Courtney to the Ophthalmology Department at VCU.

229.   In January 2022, Mr. Courtney informed Greensville officials that he had a broken right contact lens—the same contact lens that had been broken for over a year.

230.   On April 29, 2022, Mr. Courtney submitted an Emergency Grievance to Greensville officials, stating that his eyes hurt, he could barely see, and that he needed immediate medical care.

231.    On May 6, 2022, Defendant Dr. Gore admitted Mr. Courtney to the infirmary "for his safety."

232.    On May 9, 2022, Mr. Courtney saw Benjamin Goldman, M.D., at VCU Ophthalmology, who examined the topography of Mr. Courtney's eyes, and noted that Mr. Courtney had "progressive keratoconus" in both eyes. Dr. Goldman recommended that Mr. Courtney receive artificial tears and gel lubricant for his eyes because Mr. Courtney had holes and cracks in his corneas.

233.    On May 20, 2022, Assistant Warden Putney transferred Mr. Courtney out of the infirmary and into Housing Unit 10, even though Mr. Courtney's condition had not improved, he still had only one contact, and had not been given artificial tears or gel lubricant for his eyes.

234.    On July 12, 2022, Mr. Courtney visited William Benson, M.D., at VCU Ophthalmology, who scheduled Mr. Courtney for a follow-up visit for a right contact lens fitting.

235.    On July 20, 2022, Mr. Courtney saw Lenna Walker, M.D., at VCU Ophthalmology who fitted him for contact lenses. Dr. Walker further ordered that Greensville supply him with contact lens cleaning solution and 0.9% sodium chloride solution to use before inserting the contacts into his eyes and stated that she had requested to see Mr. Courtney for his follow-up appointment at least six times.

236.    In August 2022, Defendant Dr. Gore denied Mr. Courtney the contact lens cleaning solution Dr. Walker prescribed.

237.    Mr. Courtney has continued to have issues receiving regular appointments with the ophthalmologists at VCU who treat his keratoconus, as well as the cleaning solution for his contact lenses and the 0.9% sodium chloride solution that he must apply before inserting his contact lenses.

238. Mr. Courtney's eyesight has worsened during this period of time in which Defendants VDOC, Edmonds, Punturi, Talbott, Armor, VitalCore, and Dr. Gore have failed to ensure that he has regular appointments and medical treatment for his eyes, leading to physical pain from his increasingly bulging, swollen eyes, infection, and significant emotional distress.

**2.   William Stravitz**

239. Mr. Stravitz's blindness is caused by cataracts, with which he was diagnosed in fall 2021, while in VDOC custody.

240. Five months later, in March 2022, Mr. Stravitz had a follow-up appointment, during which the ophthalmologist, Defendant Dr. Gupta, verified that he has cataracts and told Mr. Stravitz that he would schedule cataract surgery to have them removed.

241. Since March 2022, Mr. Stravitz has submitted a written request and has made several verbal requests to see the surgeon, but he has yet to see a surgeon.

242. Mr. Stravitz was scheduled to see Defendant Dr. Gupta on August 9, 2022, but VDOC failed to give him a COVID-19 PCR test and, as a result, Defendant Dr. Gupta refused to see Mr. Stravitz.

243. On September 20, 2022, Deerfield officials administered a COVID-19 PCR test to Mr. Stravitz, and he tested negative, but VDOC did not take him to see Defendant Dr. Gupta.

244. On September 28, 2022, Mr. Stravitz filed a "Facility Request" inquiring about the status of his follow-up appointment with Dr. Gupta. The next day, Defendant Nurse Lester responded, "It is coming up."

245. Defendants VDOC, Miller, Armor, VitalCore, Dr. Harris, and Nurse Lester still have not scheduled Mr. Stravitz's follow-up appointment with Dr. Gupta or otherwise taken any action to get him medically necessary surgery for his cataracts.

246.     Defendants VDOC, Miller, Armor, VitalCore, and Dr. Harris refuse to provide Mr. Stravitz with eyeglasses because they claim they are not worth getting because Mr. Stravitz is going to get surgery.

247.     As Mr. Stravitz waits to undergo surgery, his vision is getting progressively worse, leading to increased discomfort, mental anguish, and emotional distress.

## G.     Retaliation

248.     Mr. Courtney, through counsel, sent a letter to Defendant Clarke regarding VDOC's failure to provide him with reasonable accommodations and letters to Defendant Talbott, regarding VDOC's and Greensville's failures to provide him with cleaning solution for his contacts and the sodium chloride necessary for inserting his contacts into his eyes.

249.     Mr. Courtney has not taken illegal drugs of any kind while incarcerated.

250.     Until Greensville's most recent test in December 2022, Mr. Courtney has never tested positive for illegal drugs on a urinalysis while in prison.

251.     Mr. Courtney has never routinely been tested for drugs while in prison; he has only been drug tested five or six times while in VDOC custody.

252.     Upon information and belief, VDOC urinalysis procedures require investigators to conduct the tests and to seal the test materials on camera.

253.     On December 20, 2022, Defendant Smith subjected Mr. Courtney and four other prisoners to urinalyses. Defendant Smith told Mr. Courtney this was a "routine drug test."

254.     However, Defendant Smith escorted Mr. Courtney and one of the other prisoners to a staff bathroom, which does not contain any cameras, to administer their urinalyses.

255.    Urinalyses typically test for five substances: marijuana, methamphetamines, cocaine, opiates, and suboxone. The urinalysis Defendant Smith administered to Mr. Courtney only tested for two substances—marijuana and methamphetamines.

256.    On December 20, 2022, Mr. Courtney was informed that his urinalysis came back positive for marijuana and methamphetamines—the only two drugs Defendant Smith tested Mr. Courtney's urine for. Mr. Courtney received a charge for the positive drug test.

257.    Mr. Courtney's release date is March 16, 2023. If he is found guilty at the hearing on this charge, he may be forced to stay in prison until November 2023. He would also lose his in-person visitation, video visitation, commissary, and telephone privileges for 30–90 days. Mr. Courtney's wife and children speak with him over the phone on an almost daily basis and visit him almost every weekend. The loss of the ability to speak to and see his wife and children for 30–90 days would be devastating to Mr. Courtney.

258.    Defendants VDOC, Punturi, Smith, and Talbott had no reason to suspect Mr. Courtney of taking drugs and the urinalysis testing was out of the normal course of business at Greensville. The urinalysis of Mr. Courtney was not conducted in accordance with VDOC procedures for such tests.

259.    On information and belief, Mr. Courtney's urinalysis test results were falsified in retaliation for his continued complaints against VDOC and Greensville for failing to accommodate is disability.

## FIRST CLAIM FOR RELIEF:
## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12131 *et seq.*
### (All Plaintiffs against VDOC and VDOC Defendants, in their official capacities)

260.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

261.    Title II of the ADA prohibits public entities, such as VDOC and VDOC Defendants, from excluding individuals with disabilities from participation in, denying them the benefits of, offering them unequal access to, or otherwise subjecting such individuals to discrimination in their services, programs and activities. 42 U.S.C. § 12132.

262.    Defendants excluded the Individual Plaintiffs and other blind prisoners from participation in, denied them the benefits of, and subjected them to discrimination in VDOC services, programs, and activities on the basis of disability, in violation of Title II and its implementing regulations as more fully described in this Complaint.

263.    Such discrimination includes but is not limited to:

   a.   denying the Individual Plaintiffs and other blind prisoners the opportunity to participate in or benefit from VDOC's aids, benefits, or services, *see* 28 C.F.R. § 35.130(b)(1)(i);

   b.   affording the Individual Plaintiffs and other blind prisoners opportunities to participate in or benefit from aids, benefits, or services that are not equal to those afforded others, *see id.* § 35.130(b)(1)(ii);

   c.   providing the Individual Plaintiffs and other blind prisoners with aids, benefits, or services that are not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others, *see id.* § 35.130(b)(1)(iii);

   d.   using criteria and methods of administration that have the effect of subjecting the Individual Plaintiffs and other blind prisoners to discrimination on the basis of disability, *see id.* § 35.130(b)(3)(i);

    e.   using criteria and methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of VDOC's programs with respect to the Individual Plaintiffs and other blind prisoners, *see id.* § 35.130(b)(3)(ii);

    f.   failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *see id.* § 35.130(b)(7);

    g.   failing to ensure that communications with the Individual Plaintiffs and other blind prisoners are as effective as communications with others, *see id.* § 35.160(a)(1);

    h.   failing to furnish appropriate auxiliary aids and services where necessary to afford the Individual Plaintiffs and other blind prisoners an equal opportunity to participate in, and enjoy the benefits of, VDOC's services, programs, or activities, *see id.* § 35.160(b)(1); and

    i.   failing to give primary consideration to the requests of the Individual Plaintiffs and other blind prisoners concerning the types of auxiliary aids and services necessary, *see id.* § 35.160(b)(2).

264.   Because they are blind, the Individual Plaintiffs and other blind prisoners are individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12102.

265.   Defendants know that the Individual Plaintiffs and other blind prisoners are blind.

266.   The Individual Plaintiffs' and other blind prisoners' need for reasonable modifications and auxiliary aids and services is obvious.

267.    The Individual Plaintiffs and other blind prisoners are qualified to participate in VDOC's services, programs, and activities.

268.    The actions of Defendants described in this Complaint were intentional or were taken with deliberate indifference to the strong likelihood that their policies and practices would likely result in a violation of the ADA rights of the Individual Plaintiffs and other blind prisoners.

269.    As a direct and proximate result of Defendants' acts, omissions, and violations alleged above, the Individual Plaintiffs have suffered damages, including, but not limited to, pain and suffering, inconvenience, and dignitary harm as more fully described above.

270.    The Individual Plaintiffs and other blind prisoners have been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' discrimination.

**SECOND CLAIM FOR RELIEF:**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12131 *et seq.***
**(Nacarlo Courtney against Defendant VDOC, and Defendants Clarke, Marano, Talbott, and Punturi, in their official capacities)**

271.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

272.    The ADA prohibits retaliation for engaging in a protected activity. 42 U.S.C. § 12203(a)–(b).

273.    Mr. Courtney engaged in a protected activity when, through counsel, he submitted a letter to Defendant Clarke regarding VDOC's failure to provide him with reasonable accommodations and letters to Defendant Talbott, regarding VDOC's and Greensville's failures to provide him with cleaning solution for his contacts and the sodium chloride necessary for inserting his contacts into his eyes.

274.     Upon information and belief, as a result of Mr. Courtney engaging in protected activity, Defendants Talbott, Smith, and Punturi, subjected him to a drug test that did not follow the required testing procedures and resulted in test that was allegedly positive for marijuana and methamphetamines. Because of this allegedly positive test result, Defendant Smith wrote Mr. Courtney a charge.

275.     As a direct and proximate result of Mr. Courtney engaging in protected activity, VDOC and Defendants Clarke, Marano, Talbott, and Punturi falsified the results of Mr. Courtney's drug test so that he would receive a charge.

**THIRD CLAIM FOR RELIEF:**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794**
**(All Plaintiffs against VDOC and VDOC Defendants, in their official capacities)**

276.     Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

277.     Section 504 prohibits discrimination on the basis of disability by recipients of federal financial assistance such as VDOC. 29 U.S.C. § 794.

278.     Defendants excluded the Individual Plaintiffs and other blind prisoners from participation in, denied them the benefits of, and subjected them to discrimination in VDOC services, programs, and activities solely by reason of disability in violation of Section 504 and its implementing regulations as more fully described in this Complaint.

279.     Such discrimination includes but is not limited to:

    a.  denying the Individual Plaintiffs and other blind prisoners opportunities to participate in VDOC's programs and activities, *see* 28 C.F.R. § 42.503(b)(1)(i);

    b.   denying the Individual Plaintiffs and other blind prisoners an equal opportunity to achieve the same benefits that others achieve in VDOC's programs and activities, *id.* § 42.503(b)(1)(ii);

    c.   using criteria or methods of administration that either purposely or in effect discriminate on the basis of disability or defeat or substantially impair accomplishment of the objectives of VDOC's programs or activities with respect the Individual Plaintiffs and other blind prisoners, *id.* § 42.503(b)(3);

    d.   failing to provide appropriate auxiliary aids to the Individual Plaintiffs and other blind prisoners, thereby discriminatorily impairing or excluding them from participation in VDOC's programs and activities, *see id.* § 42.503(f); and

    e.   failing to provide reasonable accommodations to the Individual Plaintiffs and other blind prisoners as necessary to ensure that they have meaningful access to VDOC's programs, activities, or benefits, *see Alexander v. Choate*, 469 U.S. 287, 300–01 (1985).

280.    Because they are blind, the Individual Plaintiffs and other blind prisoners are individuals with disabilities within the meaning of Section 504. 29 U.S.C. § 794.

281.    Defendants know that the Individual Plaintiffs and other blind prisoners are blind.

282.    The Individual Plaintiffs' and other blind prisoners' need for accommodations and auxiliary aids and services is obvious.

283.    The Individual Plaintiffs and other blind prisoners are qualified to participate in VDOC's services, programs, and activities within the meaning of Section 504.

284.    The actions of Defendants discriminated against the Individual Plaintiffs and other blind prisoners solely by reason of their disabilities.

285.     The actions of Defendants described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that their policies and practices would likely result in a violation of the Section 504 rights of the Individual Plaintiffs and other blind prisoners.

286.     As a direct and proximate result of Defendants' acts, omissions, and violations alleged above, the Individual Plaintiffs have suffered damages, including but not limited to pain and suffering, inconvenience, and dignitary harm as more fully described above.

287.     The Individual Plaintiffs and other blind prisoners have been injured and aggrieved by and will continue to be injured and aggrieved by Defendants' discrimination.

**FOURTH CLAIM FOR RELIEF:**
**VIOLATION OF THE VIRGINIANS WITH DISABILITIES ACT**
**Va. Code Ann. § 51.5-40**
**(All Plaintiffs against VDOC and VDOC Defendants, in their official capacities)**

288.     Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

289.     The Virginians with Disabilities Act ("VDA"), Va. Code Ann. § 51.5-40 prohibits discrimination on the basis of disability under state grants and programs and is interpreted consistently with the ADA. *See, e.g.*, *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 216 (4th Cir. 1994).

290.     Defendants excluded the Individual Plaintiffs and other blind prisoners from participation in, denied them the benefits of, and subjected them to discrimination in its services, programs, and/or activities on the basis of disability in violation of the VDA as more fully described in this Complaint.

291.     Such discrimination includes, but is not limited to:

a.  denying the Individual Plaintiffs and other blind prisoners opportunities to participate in VDOC's programs and activities;

b.  denying the Individual Plaintiffs and other blind prisoners an equal opportunity to achieve the same benefits that others achieve in VDOC's programs and activities;

c.  using criteria or methods of administration that either purposely or in effect discriminate on the basis of disability or defeat or substantially impair accomplishment of the objectives of VDOC's programs or activities with respect the Individual Plaintiffs and other blind prisoners;

d.  failing to provide appropriate auxiliary aids to the Individual Plaintiffs and other blind prisoners, thereby discriminatorily impairing or excluding them from participation in VDOC's programs and activities; and

e.  failing to provide reasonable accommodations to the Individual Plaintiffs and other blind prisoners as necessary to ensure that they have meaningful access to VDOC's programs, activities, or benefits.

292.   Because they are blind, the Individual Plaintiffs and other blind prisoners are persons with disabilities within the meaning of the VDA. Va. Code Ann. § 51.5-40.1.

293.   Defendants know that the Individual Plaintiffs and other blind prisoners are blind.

294.   The Individual Plaintiffs' and other blind prisoners' need for accommodations and auxiliary aids and services is obvious.

295.   The Individual Plaintiffs and other blind prisoners are qualified to participate in VDOC's services, programs, and activities within the meaning of the VDA.

296.    Defendants' actions described in this Complaint were intentional and/or were taken with deliberate indifference to the strong likelihood that their policies and practices would likely result in a violation of the VDA rights of the Individual Plaintiffs and other blind prisoners.

297.    As a direct and proximate result of Defendants' acts, omissions, and violations alleged above, the Individual Plaintiffs have suffered damages, including but not limited to pain and suffering, inconvenience, and dignitary harm as more fully described above.

298.    The Individual Plaintiffs and other blind prisoners have been injured and aggrieved by, and will continue to be injured and aggrieved by, Defendants' discrimination.

**FIFTH CLAIM FOR RELIEF:**
**BREACH OF MINISTERIAL DUTY TO PROCURE ACCESSIBLE TECHNOLOGY**
**Va. Code Ann. § 2.2-2012**
**(Mandamus Relief)**
**(All Plaintiffs against Defendants VDOC and VITA, and Defendants Clarke, Miller, and Punturi, in their official capacities)**

299.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

300.    Virginia law requires Defendant VITA—and any state agency authorized by VITA—to procure information technology for state agencies that complies with Section 508 of the Rehabilitation Act of 1973 ("Section 508"), 29 U.S.C. § 794d, and any regulations promulgated by VITA. Va. Code § 2.2-2012.

301.    VITA and VDOC share the responsibility of procuring information technology for the Virginia prison system. *See, e.g.*, Va. Dep't of Corr. OP 260.1, Procurement of Goods and Services. As such, both VITA and VDOC are required to procure technology in accordance with Section 508 standards. Va. Code § 2.2-2012(B)(1).

302.     VITA and VDOC's adherence to Section 508 is non-discretionary. Therefore, VITA and VDOC both have a clear legal duty to provide accessible technology, including computers, tablets, and kiosks, to blind people in VDOC's custody.

303.     Individual Plaintiffs and other blind prisoners have a clear legal right to accessible prison technology procured by VITA and VDOC.

304.     The information technology available to Individual Plaintiffs and other blind prisoners fails to comply with Section 508's implementation standards, in violation of Va. Code § 2.2-2012.

305.     Such failures include, but are not limited to:

a.   failing to maintain touchscreens and contact-sensitive controls in compliance with 36 C.F.R. § 1194(k)(1) through (4). 36 C.F.R. § 1194.25(c).

b.   failing to maintain technology to which all functionality is accessible and usable by individuals with disabilities, either directly or by supporting the use of assistive technology. 36 C.F.R. § 1194, App. A. E203.1;

c.   failing to maintain electronic content that conforms to Level A and Level AA Success Criteria and Conformance Requirements in the Web Content Accessibility Guidelines ("WCAG") 2.0. *Id.* at E204.1;

d.   failing to permit user preferences regarding application platform settings for color contrast, font type, font size, and focus cursor. 36 C.F.R. § 1194, App. C. 503.2;

e.   failing to provide user controls for the selection of audio descriptions at the same menu level as the user controls for volume or program selection. *Id.* at 503.4.2;

      f.   failing to maintain display screens that read speech-output enabled for full and independent use by individuals with vision impairments. *Id.* at 402.2.

306.    Plaintiffs have no adequate remedy at law to compel Defendants VDOC, VITA, Clarke, Miller, and Punturi to comply with their obligation to procure information technology that is accessible to blind prisoners.

307.    As a direct and proximate result of the acts, omissions, and violations alleged above, the Individual Plaintiffs have suffered damages, including, but not limited to, pain and suffering, inconvenience, emotional distress, and other pecuniary losses not yet ascertained, as more fully described above.

308.    The Individual Plaintiffs and other blind prisoners have been injured and aggrieved by, and will continue to be injured and aggrieved by, the failures of Defendants VDOC, VITA, Clarke, Miller, and Punturi.

**SIXTH CLAIM FOR RELIEF:**
**VIOLATION OF THE INFORMATION TECHNOLOGY ACCESSIBILITY ACT**
**Va. Code Ann. § 2.2-3500 *et seq*.**
**(Mandamus Relief)**
**(All Plaintiffs against Defendants VDOC and VITA, and Defendants Clarke, Miller, and Punturi, in their official capacities)**

309.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

310.    The Virginia Information Technology Accessibility Act ("ITAA") requires state agencies to ensure that their information technology equipment and software are accessible to blind and visually impaired "employees, program participants, or members of the general public." Va. Code § 2.2-3502.

311.    VDOC is a covered entity under the ITAA. Va. Code § 2.2-3501.

312.    VITA is a covered entity under the ITAA. VA. Code § 2.2-3501.

313.   VDOC's and VITA's adherence to the ITAA is non-discretionary. *Id.* §§ 2.2-3500(B), 2.2-3502. Therefore, Defendants VDOC, VITA, Clarke, Miller, and Punturi have a clear legal duty to provide accessible technology to blind program participants.

314.   Individual Plaintiffs and other blind prisoners are "participants" in VDOC's many programs that require the use of technology in prisons.

315.   These programs include, but are not limited to, VDOC's commissary, communications, legal research, vocational, and other programs that require the use of kiosks, computers, tablets and other technology. Individual Plaintiffs and other blind prisoners, therefore, have a clear legal right to accessible  technology.

316.   Defendants have failed to ensure that the technology they procure provides access to Individual Plaintiffs and other blind prisoners equivalent to that which their sighted peers receive. Va. Code § 2.2-3502(i).

317.   Defendants have failed to ensure that VDOC's technology is designed to present information in formats adaptable to both visual and nonvisual use. Va. Code § 2.2-3502(ii).

318.   On information and belief, Defendants have failed to ensure that prison technologies have been purchased under a contract that includes the technology access clause required pursuant to Va. Code § 2.2-3503. Va. Code § 2.2-3502(iii).

319.   Technologies provided by VDOC (*e.g.*, JP6 tablets, computers, kiosks, etc.) are inaccessible in violation of Va. Code §2.2-3502 because they do not include essential features for accessibility. These features include, but are not limited to, adjustable brightness, adjustable color contrast, adjustable text and image size, and text-to-speech capability.

320.    Unlike their sighted peers, Individual Plaintiffs and other blind prisoners are unable to use many of the technologies in the VDOC facilities where they are housed because the technologies are inaccessible.

321.    Plaintiffs have no adequate remedy at law to compel Defendants to comply with their obligation to ensure that VDOC's information technology is accessible to blind prisoners.

322.    As a direct and proximate result of the acts, omissions, and violations alleged above, the Individual Plaintiffs have suffered damages, including, but not limited to, pain and suffering, inconvenience, and emotional distress as more fully described above.

323.    The Individual Plaintiffs and other blind prisoners have been injured and aggrieved by, and will continue to be injured and aggrieved by, the failures of Defendants.

**SEVENTH CLAIM FOR RELIEF:**
**VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION AND 42 U.S.C. § 1983**
**(Nacarlo Courtney against Defendants VDOC, Edmonds, Punturi, Marano, Talbott, Armor, VitalCore, and Dr. Gore)**

324.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

325.    At all relevant times, Defendants knew that Mr. Courtney has keratoconus, a serious medical condition which jeopardizes his vision.

326.    Defendants knew that failing to schedule eye exams at least every six months to monitor Mr. Courtney's keratoconus, failing to replace Mr. Courtney's contact lenses, failing to provide him with contact lens solution for cleaning and storing his lenses, and failing to provide him with sodium chloride solution necessary for inserting the contacts into his eyes caused Mr. Courtney physical pain and infection, caused his eyes to swell, made his vision deteriorate, and caused him mental and emotional distress.

327.    Defendants knew that Mr. Courtney required eye exams and evaluations for replacement contacts every six months, to monitor and potentially slow down or halt the progression of corneal deformation caused by keratoconus.

328.    Mr. Courtney's medical records and the prevailing standards of care support the medical necessity for routine eye exams and replacement contact lenses, as well as contact lens solution and sodium chloride solution for Mr. Courtney.

329.    Defendants knew that denying Mr. Courtney routine eye exams, replacement contact lenses, cleaning solution, and sodium chloride solution placed him at a substantial risk of serious harm, including physical pain, infections, further vision loss, depression, anxiety, and future harm as Mr. Courtney's condition worsened.

330.    The actions of Defendants described herein showed deliberate indifference to Mr. Courtney's medical needs by refusing to provide him with necessary medical treatment for his keratoconus and were taken without exercising any individualized medical judgment.

331.    The denial of medically necessary treatment by Defendants has caused and is causing irreparable harm to Mr. Courtney.

332.    As a direct and proximate result of the purposeful and intentional actions of Defendants, Mr. Courtney has suffered and continues to suffer injury, including, without limitation, serious physical harm, mental anguish, emotional distress, and other pecuniary losses not yet ascertained.

**EIGHTH CLAIM FOR RELIEF:**
**VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION**
**AND 42 U.S.C. § 1983**
**(William Stravitz against Defendants VDOC, Miller, Williams, Armor, VitalCore, Dr.**
**Harris, Nurse Lester, and Dr. Gupta)**

333.   Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

334.   Defendants deprived and continue to deprive Mr. Stravitz of his constitutionally protected rights under the Eighth Amendment to the U.S. Constitution.

335.   At all relevant times, Defendants knew that Mr. Stravitz has cataracts, a serious medical condition, which jeopardizes his vision.

336.   Defendants knew that Defendant Dr. Gupta recommended that Mr. Stravitz receive surgery to remove his cataracts.

337.   Defendants knew that the medically accepted treatment for cataracts is surgery, which completely removes the cataract or cataracts that impair a person's vision.

338.   Mr. Stravtitz's medical records and the prevailing standards of care support the medical necessity for cataract surgery for Mr. Stravitz.

339.   Defendants knew that denying Mr. Stravitz cataract surgery placed him at a substantial risk of serious harm, including further vision loss, physical discomfort, depression, anxiety, and future harm as Mr. Stravitz's condition worsened.

340.   Defendants ignored multiple requests for medical treatment, in deliberate indifference to Mr. Stravitz's serious medical needs and in violation of his Eighth Amendment rights.

341.   The actions of Defendants described herein showed deliberate indifference to Mr. Stravitz's medical needs by refusing to provide him with necessary medical treatment for his

cataracts, including the failure to provide him with prescription eyeglasses, and were taken without exercising any individualized medical judgment.

342.    The denial of medically necessary treatment by Defendants has caused and is causing irreparable harm to Mr. Stravitz.

343.    As a direct and proximate result of the purposeful and intentional actions of Defendants, Mr. Stravitz has suffered and continues to suffer injury, including, without limitation, mental anguish, emotional distress, and other pecuniary losses not yet ascertained.

**NINTH CLAIM FOR RELIEF**
**Violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Nacarlo Courtney against Defendants Punturi, Talbott, and Smith, in their individual capacities)**

344.    Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

345.    Defendants had no basis to believe Mr. Courtney, who had never tested positive for drugs, and who does not use illegal drugs, was taking illegal drugs.

346.    Defendants subjected Mr. Courtney to urinalysis on December 20, 2022, without following appropriate VDOC procedures.

347.    The resulting positive test result is not attributable to Mr. Courtney, who does not use drugs.

348.    Defendants knew that Mr. Courtney's counsel had written to Defendant Clarke challenging VDOC's failure to comply with the ADA and Section 504 and failure to provide appropriate medical treatment and had written to Defendant Talbott challenging VDOC's failure to provide Mr. Courtney's needed medical treatment.

349.    Defendants knew Mr. Courtney is scheduled to be released in March 2023.

350.    Defendants knew a positive drug test would risk delaying Mr. Courtney's scheduled release date and a suspension of his in-person visitation and phone privileges, which he uses on a weekly basis to see and speak with his wife and two daughters.

351.    The actions of Defendants described herein were intentional.

352.    As a direct result of the purposeful and intentional acts of Defendants, Mr. Courtney has suffered, and continues to suffer, injury, including mental anguish, emotional distress, and other pecuniary losses not yet ascertained.

**TENTH CLAIM FOR RELIEF:**
**GROSS NEGLIGENCE**
**(All Plaintiffs against VDOC Defendants and Defendants Edmonds, Williams, and Smith in their individual capacities)**

353.    Plaintiffs incorporate the allegations set forth set forth in the remainder of this Complaint as if fully set forth herein.

354.    Defendants have failed to comply with professional standards in the treatment, care, and supervision of blind prisoners, including the Individual Plaintiffs, during their incarceration.

355.    Defendants' failures include: failing to provide Mr. Stravitz and Mr. Courtney with timely and necessary medical treatment; falsifying Mr. Courtney's positive drug test; failing to provide reasonable accommodations and appropriate auxiliary aids to all Plaintiffs; and denying all Plaintiffs access to programs and services at Deerfield and Greensville, respectively.

356.    Defendants Williams, Miller, Edmonds, and Punturi failed to adequately supervise, review, and ensure meaningful access to programs and services, and failed to ensure compliance with appropriate standards and procedures that would have prevented the harm experienced by the Individual Plaintiffs.

357.     Defendants Williams, Miller, Edmonds, and Punturi failed to adequately supervise, review, and ensure the provision of adequate medical care and treatment to Mr. Stravitz and Mr. Courtney by medical staff.

358.     Defendants acted negligently and improperly, breached their respective duties to the Individual Plaintiffs, and the Individual Plaintiffs suffered injuries and damages as alleged herein as a direct and proximate result.

359.     Defendants' negligent conduct was committed within the course and scope of their employment.

360.     Defendants conducted these acts with willful and conscious disregard for the federal rights, health, and safety of the Individual Plaintiffs, putting these vulnerable prisoners at an obvious risk of harm.

## ELEVENTH CLAIM FOR RELIEF:
## NEGLIGENCE
### (Nacarlo Courtney against  Armor, VitalCore, and Dr. Gore)

361.     Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

362.     Defendants had, among other duties, duties to exercise reasonable care with regard to the provision of medical care to Mr. Courtney, including prompt medical care for his keratoconus, a degenerative eye disease. Defendants breached this duty.

363.     Under the doctrine of *respondeat superior*, Defendants Armor and VitalCore are legally responsible for the actions and inactions of their employee and/or agent, Defendant Dr. Gore, which were performed in the scope of his employment/duties with Armor or VitalCore.

364. Defendants owed a duty to Mr. Courtney to treat him in accordance with recognized and acceptable standards of medical care, health care, nursing care, and treatment. Defendants breached this duty.

365. As described in this Complaint, Defendants breached duties owed to Mr. Courtney, and these breaches constituted negligence.

366. As a direct and proximate result of the negligence of Defendants, Mr. Courtney has suffered physical pain, mental anguish, and emotional distress.

367. The negligence of Defendants establishes causes of action for monetary relief in the form of compensatory damages and costs to Mr. Courtney.

### TWELFTH CLAIM FOR RELIEF:
### NEGLIGENCE
**(William Stravitz against Armor, VitalCore, Dr. Harris, Nurse Lester, and Dr. Gupta)**

368. Plaintiffs incorporate the allegations set forth in the remainder of this Complaint as if fully set forth herein.

369. Defendants had, among other duties, duties to exercise reasonable care with regard to the provision of medical care to Mr. Stravitz, including prompt medical care and treatment for his cataracts. Defendants breached this duty.

370. Under the doctrine of *respondeat superior*, Defendants Armor and VitalCore are legally responsible for the actions and inactions of their employees and/or agents, Defendants Dr. Harris, Nurse Lester, and Dr. Gupta, which were performed in the scope of their employment/duties with Armor or VitalCore.

371. Defendants owed a duty to Mr. Stravitz to treat him in accordance with recognized and acceptable standards of medical care, health care, nursing care, and treatment. Defendants breached this duty.

372.    As described in this Complaint, Defendants breached duties owed to Mr. Stravitz, and these breaches constituted negligence.

373.    As a direct and proximate result of the negligence of Defendants, Mr. Stravitz has suffered mental anguish, and emotional distress.

374.    The negligence of Defendants establishes causes of action for monetary relief in the form of compensatory damages and costs to Mr. Stravitz.

**WHEREFORE, Plaintiffs respectfully request:**

375.    That this Court assume jurisdiction;

376.    That this Court declare the actions of Defendants described in this Complaint to be in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Virginians with Disabilities Act, the Virginia Information Technology Access Act, and the Eighth and Fourteenth Amendments to the U.S. Constitution, and constituted negligence and gross negligence;

377.    That this Court enter an injunction ordering VDOC Defendants to cease violating the rights of blind prisoners, including the Individual Plaintiffs, and to cease discriminating against them on the basis of disability;

378.    That this Court enjoin VDOC Defendants from failing to reasonably modify VDOC policies, procedures and practices and from failing to provide auxiliary aids and services necessary for blind prisoners, including Individual Plaintiffs, to access VDOC documents, legal research and other information, mail, educational program materials, work program materials, and other printed materials independently and privately;

379.    That this Court enjoin VDOC Defendants from refusing to ensure that blind prisoners, including Individual Plaintiffs, have equal opportunity to participate in and benefit from educational and work programs available to sighted prisoners;

380.    That this Court enjoin VDOC Defendants from housing Individual Plaintiffs in dorm-style living, and provide them a double cell with their Caregiver or a single cell when appropriate;

381.    That this Court enjoin VDOC Defendants from denying blind prisoners, including Individual Plaintiffs, the ability to read, write, conduct legal and other research, and access other VDOC programs independently and privately without unnecessarily relying on Caregivers or other prisoners;

382.    That this Court enjoin Defendants VDOC, VITA, Miller, and Punturi to replace existing inaccessible technology with accessible technology;

383.    That this Court order Defendants to re-hire Mr. Hajacos in the inventory position in the woodshop that he previously held without having to move to a different pod and give up his accommodations;

384.    That this Court order Defendants to provide Mr. Courtney with medically necessary treatment for his keratoconus, including but not limited to corneal cross-linking therapy;

385.    That this Court order Defendants to provide Mr. Stravitz with cataract surgery;

386.    That this Court award Individual Plaintiffs compensatory damages;

387.    That this Court award Plaintiffs and/or their attorneys reasonable attorneys' fees, costs, and expenses; and

388.    That this Court award such additional or alternative relief as may be just, proper, and equitable.

## JURY DEMAND

Pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b), Plaintiffs request a jury trial on all issues and claims raised by this Complaint that are triable of right by a jury.

Respectfully submitted,

_____*/s/ Vishal Agraharkar*_____
Vishal Agraharkar
Samantha Westrum
American Civil Liberties Union of Virginia
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
804.644.8022
vagraharkar@acluva.org
swestrum@acluva.org

Rebecca Herbig
disAbility Law Center of Virginia
1512 Willow Lawn Drive, Suite 100
Richmond, Virginia 23230
804.225.2042
Rebecca.Herbig@dlcv.org

Eve L. Hill
Monica R. Basche (*pro hac vice pending*)
Evan Monod (*pro hac vice pending*)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
410.962.1030
ehill@browngold.com
mbasche@browngold.com
emonod@browngold.com

*Attorneys for Plaintiffs*

Dated:  February 15, 2023