IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

THE NATIONAL FEDERATION OF )
THE BLIND OF VIRGINIA, *et al.*, )
  )
      Plaintiffs, )
  )
v. )     Civil Action No. 3:23-cv-127–HEH
  )
VIRGINIA DEPARTMENT OF )
CORRECTIONS, *et al.*, )
  )
      Defendants. )

**MEMORANDUM OPINION**
**(Resolving Pending Motions)**

      This matter is before the Court on Defendants'[1] Motions to Dismiss (ECF Nos. 42,

46, 57), filed pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

Plaintiffs' Complaint (ECF No. 1) brings twelve (12) claims[2] against Defendants,

---

[1] Defendants include: the Virginia Department of Corrections ("VDOC"); Harold Clarke ("Clarke"), Director of the VDOC, in his individual and official capacities; Barry Marano ("Marano"), Americans with Disabilities ("ADA") Coordinator of the VDOC, in his individual and official capacities; Kevin Punturi ("Punturi"), Warden of Greensville Correctional Center ("Greensville"), in his individual and official capacities; Darrell Miller ("Miller"), Warden of Deerfield Correctional Center ("Deerfield"), in his individual and official capacities; Tammy Williams ("Williams"), former Warden of Deerfield, in her individual capacity; Lane Talbott ("Talbott"), ADA Coordinator of Greensville, in her individual and official capacities; Lakeisha Shaw ("Shaw"), ADA Coordinator of Deerfield, in her individual and official capacities; Larry Edmonds ("Edmonds"), former Warden of Greensville, in his individual capacity; Officer D. Smith ("Smith"), in his individual capacity; Armor Correctional Health Services, Inc. ("Armor"); VitalCore Health Strategies ("VitalCore"); Vincent Gore, M.D. ("Dr. Gore"), in his individual capacity; Alvin Harris, M.D. ("Dr. Harris"), in his individual capacity; Pranay Gupta, M.D. ("Dr. Gupta"), in his individual capacity (collectively, "Defendants").

[2] The Court notes that Plaintiffs represented both in their briefing (Pls.' Opp'n at 5 n.5, ECF No. 73) and during oral argument that they agree to dismiss their fifth claim under Va. Code § 2.2-2012 and their sixth claim under the Information Technology Accessibility Act, Va. Code § 2.2-3500. Plaintiff Nacarlo Courtney agrees to dismiss his seventh claim under the Eighth Amendment against the VDOC, Edmunds, Punturi, Marano, and Talbott, but he intends to

stemming from alleged violations of federal and state laws pertaining to discrimination and a lack of accommodations based on Plaintiffs' blindness.[3]  Plaintiffs include the National Federation of the Blind of Virginia ("NFBVA"), on behalf of current and future blind inmates within the custody of the VDOC, and seven (7) Individual Plaintiffs,[4] who allege claims based on their own individual and unique blindness disabilities.  The parties have filed extensive memoranda supporting their respective positions, and the Court heard oral argument on August 10, 2023.  For the following reasons, Defendants' Motions will be granted in part and denied in part.

## I. BACKGROUND

As mentioned previously, Plaintiffs are six (6) current VDOC inmates, one (1) former VDOC inmate,[5] and one (1) non-profit organization.  (Compl. ¶¶ 1, 50.)  Of the seven (7) Individual Plaintiffs, Hajacos and Rogers are currently incarcerated at Greensville.  (Id. ¶¶ 17, 28.)  Their allegations address circumstances pertaining to

---

maintain his Eighth Amendment claim against Armor, VitalCore, and Dr. Gore.  Plaintiff William Stravitz also agrees to dismiss his claim under the Eighth Amendment against the VDOC, Williams, and Miller, but maintains his claims against all other Defendants named in his eighth claim.  Plaintiffs also agree to dismiss their ninth claim under the Fourteenth Amendment. Regarding their tenth claim, Plaintiffs agree to dismiss their gross negligence claim against Smith.  Plaintiff Kevin Shabazz also agrees to dismiss his gross negligence claim against Defendants.

[3] Plaintiffs use "blind" in a broad sense, "to include people with low-vision and other vision impairments that substantially limit their ability to see."  (Compl. at 2 n.1.)

[4] The Individual Plaintiffs include: Nacarlo Antonio Courtney ("Courtney"); William Landrum Hajacos ("Hajacos"); Michael McCann ("McCann"); Wilbert Green Rogers ("Rogers"); Kevin Muhammad Shabazz ("Shabazz"); Patrick Shaw ("Shaw"); and William Stravitz ("Stravitz") (collectively, "Individual Plaintiffs").

[5] The Complaint alleges that Courtney is currently incarcerated at Greensville (Compl. ¶¶ 1, 10–11).  However, according to VDOC records, the VDOC released Courtney from custody on March 16, 2023.

Greensville. Four (4) of the Individual Plaintiffs—McCann, Shabazz, Shaw, and Stravitz—are currently incarcerated at Deerfield. (*Id.* ¶¶ 23, 34, 39, 45.) Their allegations address circumstances pertaining to Deerfield.

In addition to their incarceration at different VDOC facilities, the Individual Plaintiffs also experience varying degrees of blindness. (*See id.* ¶ 1.) Rogers and Shaw are "fully" or "completely" blind. (*Id.* ¶¶ 32, 43.) The remaining Individual Plaintiffs are classified as "visually impaired" and can see, albeit in a limited capacity. (*Id.* ¶¶ 13, 19, 24, 35, 47.) As such, each of their specific complaints address their individual visual needs and circumstances.

Plaintiff NFBVA[6] is a nonprofit organization that represents the interests of "blind" individuals currently within VDOC custody, and similarly situated individuals expected to enter VDOC custody in the future. (*Id.* ¶¶ 50, 55.) NFBVA's claims address alleged refusals by the VDOC and its officials "to reasonably modify VDOC policies, procedures, and practices to accommodate the Individual Plaintiffs and other blind prisoners," to provide effective accommodations and auxiliary aids and services, and to address Defendants' alleged discrimination towards prisoners based on their blindness. (*Id.* ¶ 3.) The Court will outline each Plaintiff's factual assertions in turn.

---

[6] "NFBVA is made up of blind people of all ages, their families, and friends. Its members and leaders provide advocacy and support to blind and visually impaired Virginians across the state." (Compl. ¶ 51.) NFBVA's purpose includes "ensuring that blind Virginians have full and equal access to all of the services, programs, and activities" provided by the Commonwealth of Virginia. (*Id.* ¶ 52.)

**NFBVA:**

NFBVA brings this case in a representative capacity on behalf of its incarcerated members across the VDOC and incorporates the Individual Plaintiffs' factual assertions and claims as further evidence of the alleged ongoing mistreatment and discrimination affecting blind prisoners. (*Id.* ¶ 55.) It does not seek damages in this case on its own behalf or on behalf of its members, but instead seeks injunctive and declaratory relief against Defendants. (*Id.* ¶ 57.)

NFBVA alleges generally that the VDOC and its officials do not provide information and other written materials in an "accessible format" to blind prisoners.[7] (*Id.* ¶¶ 77, 82, 84, 86, 88, 91, 93, 151.) Those materials include: commissary lists and order forms, directives, facility handbooks, facility publications, informational postings, job descriptions, memoranda, menus, orientation materials, and operating procedures. (*Id.* ¶¶ 82, 84, 86, 88, 91, 93, 151.) Additionally, the Complaint alleges that the VDOC does not provide information about educational and vocational programs in an accessible format (*id.* ¶ 135), and that the materials used in these programs are also inaccessible. (*Id.* ¶ 136.) NFBVA also contends that computers, JP6 tablets, and other related kiosks are inaccessible to blind prisoners within the VDOC. (*Id.* ¶¶ 78, 128.) It also alleges generally that blind prisoners often require the assistance of other inmates to do the

---

[7] NFBVA states that "large print, taped text, accessible electronic format, [and] Braille" are examples of accessible formats. (Compl. ¶ 77.) As Defendants note, the Complaint alleges that some Individual Plaintiffs have access to information and other written materials in "accessible formats" at their facility. (*See* Compl. ¶ 130, 138.) Although Defendants argue that these are contradictory allegations, as it relates to those specific instances, NFBVA's position is that the access is so limited to those accessible formats that it essentially constitutes no meaningful access at all.

4

following tasks: submit a grievance form and read the VDOC's related responses, request medical appointments, submit visitor information, and read and write mail. (*Id.* ¶¶ 99, 100, 102, 104, 115.) NFBVA argues that this violates blind inmates' privacy and places them in vulnerable positions. (*Id.* ¶ 111.)

It also asserts that "blind prisoners are unable to obtain Grade 3 work assignments, and are often relegated to Grade 1 'unskilled' work assignments or receive no work assignment because they are blind." (*Id.* ¶ 152.) NFBVA contends, as outlined below by some Individual Plaintiffs, that the library at Greensville does not "provide a scanner, printer, or other assistive technology," and, because of that, blind inmates "struggle to get much done" when they are able to use the library. (*Id.* ¶ 129.) While the library at Deerfield does provide a SARA scanner,[8] NFBVA alleges that, due to restraints on some blind prisoners' schedules, they "are not always able to get to the law library during the week to use the SARA scanner." (*Id.* ¶ 131.) Additionally, NFBVA states that the library computers at Deerfield do not have "assistive technology to allow blind prisoners to access documents on the library computers." (*Id.* ¶ 132.)

**<u>Plaintiff Courtney (Greensville):</u>**

Courtney is visually impaired and alleges that, due to a lack of accessible formats, he relied on other inmates to read almost all of his incoming mail while incarcerated. (*Id.* ¶ 117.) He also needed other inmates to write documents for him. (*Id.* ¶ 119.) These required actions gave other prisoners "access to private information about both [him] and

---

[8] "A SARA scanner converts printed text into spoken text." (Compl. ¶ 130.)

[his] family members . . . as well as privileged discussions with [his] criminal and civil attorneys." (*Id.* ¶ 117.)

While incarcerated at Greensville, Courtney enrolled in a college course. (*Id.* ¶ 137.) He contends that the course materials were not accessible to him and that he was not provided with a "qualified reader"[9] or extra time to complete his assignments. (*Id.*) Courtney also alleges that, from January 2019 to May 2019, he had a prison work assignment as a "prisoner advisor," which included "read[ing] charges to prisoners." (Compl. ¶ 162.) He states that VDOC removed him from this position because of his vision loss. (*Id.*) Although he was interested in pursuing other work assignments, he was never provided with a new assignment. (*Id.*)

When Courtney was incarcerated at Sussex-II,[10] the prison granted his requests for special accommodations such as a larger computer tablet, a fifteen-inch television, dimmer light, and the ability to cover the window in his cell. (*Id.* ¶¶ 167–68.) Allegedly, when Courtney was transferred to Greensville in November 2021, he was not permitted to have those same accommodations. (*Id.* ¶ 169.) During his incarceration at Greensville, he submitted further requests for special accommodations to Defendants Marano and Talbott, who ultimately "routed all Mr. Courtney's requests to Medical for approval." (*Id.* ¶¶ 174–78.) However, he allegedly received no response, and the accommodations were never provided. (*Id.* ¶¶ 178–79.)

---

[9] A "qualified reader" is "a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary." 28 C.F.R. § 35.104.

[10] Sussex-II is a VDOC correctional facility located in Waverly, VA.

Courtney also complains that he continually had "issues receiving regular [medical] appointments" and special cleaning solution for his contact lenses. (*Id.* ¶¶ 232, 234–35, 237.) These contact lenses were required for the treatment and mitigation of his keratoconus.[11] (*Id.* ¶¶ 235, 237.) He alleges that the delay in receiving the appropriate contact lenses or solution resulted in deterioration of his eye condition and caused him emotional distress. (*Id.* ¶ 238.)

Additionally, during his incarceration at Greensville, Courtney specifically made formal complaints to Defendants Clarke and Talbott. (*Id.* ¶¶ 248, 273.) Courtney asserts that, due to his complaints, Defendants Punturi, Smith, and Talbott retaliated and subjected him to a "routine drug test" and falsified positive test results. (*Id.* ¶¶ 253, 256, 258–59, 274–75.) He contends that he could have faced a longer term of incarceration because of the test results, but Courtney was released from VDOC custody on March 16, 2023. (*Id.* ¶ 257.)

**Plaintiff Hajacos (Greensville):**

Due to his visual impairment, Hajacos also requires other inmates to read almost all of his incoming mail. (Compl. ¶ 117.) Hajacos further alleges that at times he needs to pay other inmates to read and write documents on his behalf. (*Id.* ¶ 123.) He contends that this also gives other inmates access to private information about him and his family as well as "privileged discussions with [his] criminal and civil attorneys." (*Id.* ¶ 117.)

---

[11] Courtney explains that his keratoconus "causes his corneas to thin and bulge into a cone shape, resulting in the loss of his vision and sensitivity to light." (Compl. ¶ 216.)

Hajacos is currently enrolled in a computer course offered at Greensville. (*Id.* ¶ 140.) However, because Hajacos is visually impaired and has been provided no accommodations, his classmates must read the course textbook to him. (*Id.*) He contends that neither the VDOC nor Greensville assigned a reader to him, and that none of the prisoners in his computer course are "qualified readers" as allegedly required by the ADA. (*Id.*) He also complains that he is limited in the amount of time he can spend in the library—about two (2) hours per visit—and that, because there is no assistive technology at Greensville, this limited time does not allow him "to get much done." (*Id.* ¶ 129.)

In early 2020, Hajacos began a job working in the woodshop. (*Id.* ¶ 163.) However, in May 2020, the woodshop was forced to close down because of a COVID-19 outbreak at Greensville. (*Id.*) The woodshop reopened in June 2020, but Greensville required all woodshop employees to move into two (2) pods—"pods in which [] Hajacos did not reside and which were not designed to accommodate individuals with disabilities." (*Id.*) Hajacos alleges that he was given two choices: (1) move pods to keep his woodshop job but lose all of the accommodations he had in his current housing unit; or (2) stay in his current housing unit but lose his woodshop job. (*Id.*) Hajacos stayed in his housing unit to keep his accommodations. (*Id.*) By doing so, he lost his job and alleges he has not been able to find work that pays the same rate as the prior job. (*Id.*)

**Plaintiff McCann (Deerfield):**

Like the previous Individual Plaintiffs, McCann is visually impaired, which requires him to have other inmates read almost all of his incoming mail and draft

documents on his behalf. (*Id.* ¶¶ 117, 119.) He similarly alleges that this is an invasion of his privacy and gives other inmates access to privileged attorney-client material. (*Id.* ¶ 117.) McCann is assigned a Caregiver who helps him with certain tasks, such as "reading, writing, and navigating around Deerfield." (*Id.* ¶ 183.)

McCann alleges that he "missed the deadlines for two of his grievances because of his Caregiver." (*Id.* ¶ 124.) He contends that no accommodations are provided to allow him to submit grievances on his own. (*Id.*) For example, he "once tried to complete a grievance form himself using a Sharpie marker and writing in large print. Because the print was so large, [he needed] to attach a separate sheet of paper to detail his grievance." (*Id.*) Because he attached the additional sheet of paper and did not limit his grievance to the confines of the box on the grievance form, McCann alleges the VDOC rejected his grievance. (*Id.*)

Additionally, McCann contends that he "is considered ineligible for certain work assignments because of his blindness, including cleaning bathrooms, operating the floor buffer, and working in the kitchen." (*Id.* ¶ 154.) As an example, he was assigned to "fill the hot water pot for the other prisoners in his pod." (*Id.* ¶ 153.) However, this assignment was changed because it was deemed "too dangerous" due to his vision impairment. (*Id.*) McCann continued to request a work assignment, and the VDOC eventually gave him the position of "Assistant to the ADA coordinator," but he

complains that the job is not meaningful because he "does not do anything in this position."[12]  (*Id.* ¶ 155.)

McCann's Caregiver is assigned to a bed on the opposite side of McCann's housing unit, "which requires [] McCann to attempt to navigate through the object-strewn aisles when he needs assistance." (*Id.* ¶ 184.)  He asserts that he requested special accommodations for his Caregiver to be moved into the neighboring bed. (*Id.* ¶ 185.) However, Defendant Shaw denied his request, allegedly stating that it was "not medically necessary" and that there must be verification of the worsening vision before his Caregiver is moved. (*Id.*)  McCann contends that, when he does not have his Caregiver's assistance to navigate, he accidentally bumps into correctional officers and other inmates, "sometimes leading to physical altercations that have resulted in physical injuries to [him]." (*Id.* ¶ 186.)

McCann asserts that "[o]ther prisoners and corrections officers have taken advantage of [him] because of his disability by stealing his personal property, including, but not limited to, coffee, shorts, a baseball cap, and many commissary items." (*Id.* ¶ 188.)  In 2017 or 2018, he alleges that a fellow inmate assaulted him and, when he reported the assault to Deerfield officials, "they refused to review [the] surveillance video of the incident because [he] could not identify his assailant—something he could not do because he is blind." (*Id.* ¶ 187.)

---

[12] Deerfield asserts that new blind prisoners have not requested McCann's assistance, but he alleges that Deerfield does not appear to inform them that he is available to assist them. (Compl. ¶ 155.)  Deerfield ultimately changed McCann's job title to "Counselor's Aide," but his job duties have not changed. (*Id.*)

Before the COVID-19 pandemic, VDOC permitted McCann's Caregiver to walk with and accompany him to the recreation area at Deerfield. (*Id.* ¶ 189.) However, he alleges that, since approximately March 2020, "Deerfield officials have forced [him] to navigate to and around the recreation area without his Caregiver . . . ." (*Id.*) Additionally, Deerfield "limited him to walking back and forth on the basketball court while other prisoners are playing basketball," causing him to be hit by a basketball while exercising on several occasions. (*Id.*)

Lastly, about five (5) years ago, McCann received a magnifier from the Virginia Department of the Blind and Visually Impaired, but, because of the deterioration of his vision, the magnifying glass is no longer strong enough to be an effective auxiliary aid. (*Id.* ¶ 190.) Because of his worsening vision, he requested a new magnifier as an accommodation, but alleges that Deerfield denied his request. (*Id.* ¶ 191.)

### Plaintiff Rogers (Greensville):

Rogers became partially blind in the late 1990s and has been fully blind for the last fifteen (15) years. (*Id.* ¶ 32.) Accordingly, he also relies on other inmates to read and write his incoming mail and legal correspondence. (*Id.* ¶¶ 117, 119.)

Allegedly, after multiple requests for a Caregiver, Greensville assigned one to Rogers in July 2022. (*Id.* ¶ 122.) About a month later, however, Rogers alleges that VDOC transferred his Caregiver to a different prison. (*Id.*) According to Rogers, "Greensville has not assigned [him] a new Caregiver, despite multiple requests." (*Id.*) Instead, Rogers alleges he is forced to pay other inmates in his pod with commissary goods "to help him navigate the prison, fill out commissary bubble sheets and other

11

forms, read and write documents and correspondence for him, and take care of other daily needs." (*Id.*)

Rogers also contends that Medical issued him "single-cell orders" in the past because he is completely blind and uses a white cane to navigate. (*Id.* ¶ 211.) These orders required Rogers to be housed in a single cell without a cellmate.[13] (*Id.*) Rogers alleges he "had a single-cell order" during a previous period of incarceration. (*Id.* ¶ 213.) However, during his current incarceration at Greensville and a prior term of incarceration at Deerfield, both facilities have denied his single-cell requests. (*Id.*) He asserts that this increased the danger of navigating and that he could not locate his belongings on multiple occasions because his cellmate moved his property. (*Id.* ¶ 214.)

In the fall of 2022, Rogers' Caregiver was allowed to move into the cell with him because Rogers' prior cellmate was moved into isolation. (*Id.* ¶ 215.) However, this arrangement did not last long because his Caregiver was transferred to another facility within a few weeks. (*Id.*) Rogers now lives alone in his cell but alleges that Greensville officials told him that he will soon be moved into a shared cell. (*Id.*)

**Plaintiff Shabazz (Deerfield):**

Shabazz also relies on other inmates to read and write his incoming mail and legal correspondence. (*Id.* ¶¶ 117, 119.) He alleges that on several occasions he "has been

---

[13] Rogers contends that such single-cell orders "are typically issued for blind prisoners because being familiar with their surroundings is essential to navigating safely." (Compl. ¶ 212.) He asserts that this is to avoid tripping and other hazards related to cellmates moving their own or others' property to places unfamiliar to the blind inmate. (*Id.*)

unable to submit grievances because he had to rely on other prisoners to read the forms and complete them for him." (*Id.* ¶ 125.)

He also alleges that, due to his schedule, he does not have adequate access to the law library during the week to use the SARA scanner for legal and personal needs. (*Id.* ¶ 131.)  For example, Shabazz is allowed to use the SARA scanner for an hour on Saturdays and Sundays, "but he has to submit a request every week to receive one additional hour during the week" and the necessary request form is not available in an accessible format. (*Id.* ¶ 131.)

Shabazz has been enrolled in a computer course at Deerfield since April 2022, but asserts that the course is not accessible because the VDOC does not provide the appropriate software. (*Id.* ¶ 138.)  Shabazz states that, though the VDOC installed a trial version of speech-to-text software for him to use, it places limits on the amount of time he can use it. (*Id.*)  He is also enrolled in a GED course where the VDOC assigned a fellow inmate to read the materials to Shabazz. (*Id.* ¶ 139.)  However, there are certain graphs and other images in the materials that the inmate cannot "read," so Shabazz "has no way to access those materials." (*Id.*)

Shabazz has been assigned to do his pod's laundry—a Grade 2 work assignment— for about four (4) years. (*Id.* ¶ 156.)  He wants a Grade 3 work assignment, but asserts that the VDOC will not give him one because "his blindness poses a safety risk." (*Id.*)  Shabazz alleges that the VDOC refuses to provide him with the occupational therapy necessary for him to have a Grade 3 work assignment. (*Id.*)  He contends he submitted

applications for Grade 3 work assignments but his pod supervisor "refuses to consider his applications." (*Id.* ¶ 157.)

**Plaintiff Shaw (Deerfield):**

Shaw also relies on other inmates to read and write almost all of his incoming mail and legal correspondence with his attorneys. (*Id.* ¶¶ 117, 119.) He similarly asserts that this limits his privacy and exposes very sensitive information about himself and his family to other inmates. (*Id.*)

Though Shaw was accepted into a computer class at Deerfield approximately four (4) years ago, his Caregiver was not permitted to attend with him. (*Id.* ¶ 142.) As an alternative, Shaw requested that his Caregiver be allowed to sit outside the classroom while he was in class in case Shaw required assistance. (*Id.*) The instructor denied the request, and Shaw asserts that he "was forced to withdraw from the class." (*Id.*)

Since 2007, Shaw alleges that the VDOC has not allowed him to have a work assignment. (*Id.* ¶ 158.) He asserts the VDOC refuses to provide him with the occupational therapy necessary for him to have a work assignment. (*Id.*)

For about five (5) years, Shaw lived in one of Deerfield's single cells until the prison converted the cells into storage. (*Id.* ¶ 206.) He was then moved into a dormitory-style pod with other inmates. (*Id.*) Because of the move, Shaw must now have his Caregiver assist him when he takes a shower in the communal showers. (*Id.*) During the COVID-19 pandemic, Shaw and his Caregiver were separated, and he was allegedly "forced to pay other prisoners to take him to the shower." (*Id.* ¶ 208.) He contends that

14

he would be able to independently shower if he had access to his own shower or single stall. (*Id.* ¶ 209.)

**Plaintiff Stravitz (Deerfield)**

Currently, Stravitz can read his incoming mail and write his outgoing mail. (*Id.* ¶¶ 118, 120.) If his eyesight continues to deteriorate, he alleges that he will be required to have other inmates read his mail. (*Id.* ¶ 118.) At this time, he is working in the law library at Deerfield, however, he speculates that, in the future, he could be fired because of his diminished eyesight. (*Id.* ¶ 161.)

In late 2021, Stravitz learned he has cataracts and needs cataract surgery. (*Id.* ¶¶ 239–40.) Due to the COVID-19 pandemic and complications with obtaining a Polymerase Chain Reaction ("PCR") test, Stravitz's cataract surgery was delayed. (*Id.* ¶¶ 244–45.) He alleges that he continues to wait for this surgery, which is causing his condition to worsen, and that, in the meantime, he needs eyeglasses. (*Id.* ¶¶ 245–47.) He alleges that the VDOC and Defendants Miller and Williams deprived him and continue to deprive him of the necessary cataract surgery. (*Id.* ¶ 245.) In doing so, Defendants acted and are acting with deliberate indifference. (*Id.* ¶ 341.)

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They possess only such power as is authorized by the United States Constitution or conferred by statute. *Id.* "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of

the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)).  Accordingly, Rule 12(b)(1) allows a defendant to move for dismissal of a claim when the court lacks subject matter jurisdiction over the action.

Defendants may challenge subject matter jurisdiction on a 12(b)(1) motion in two ways.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted).  First, the defendant may "contend that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* (citation and internal quotation marks omitted).  In that case, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*  Second, a defendant can argue "that the jurisdictional allegations of the complaint [are] not true." *Id.* (citation and internal quotation marks omitted).  Under such a scenario, courts can consider evidence beyond the pleadings.  *Id.*; *see also White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).  Under either circumstance, plaintiffs carry the burden of proving subject matter jurisdiction.  *Piney Run Pres. Ass'n v. Cty. Comm'rs*, 523 F.3d 453, 459 (4th Cir. 2008).

B. Rule 12(b)(6)

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)) (internal quotations omitted).  "A complaint need only 'give the defendant fair notice of

16

what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (alteration in original) (quoting *Tobey*, 706 F.3d at 387). However, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678). However, a court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

### III. DISCUSSION

A. NFBVA's Standing

The VDOC and its officials assert that the NFBVA cannot establish associational standing in this case. (Defs.' Mem. in Supp. at 17, ECF No. 58.) Article III of the United States Constitution limits the power of federal courts to deciding "cases" and "controversies." U.S. CONST. art. III, § 2. A component of this limitation is the requirement of standing, which "ensures that a plaintiff has a personal stake in the outcome of a dispute and that judicial resolution of the dispute is appropriate." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011). An association like NFBVA can assert standing in one of two ways. "First, the association 'may have standing in its own right to seek judicial relief from injury to itself

17

and to vindicate whatever rights and immunities the association itself may enjoy.'" *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).  "Second, the association may have standing as the representative of its members who have been harmed." *Id.*

Here, NFBVA asserts no organizational injury to itself.  Instead, it asserts standing "in a representative capacity on behalf of blind prisoners in the custody of [the] VDOC and blind persons who may be placed in the custody of [the] VDOC in the future." (Compl. ¶ 55.)  It is undisputed that the Individual Plaintiffs are members of NFBVA.  In this regard, an organization has "representational standing when (1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highways Contractors Ass'n*, 933 F.2d at 1251.

The VDOC and its officials do not dispute that NFBVA satisfies the first two prongs of the representative standing analysis.  As to the disputed third prong, Defendants argue that NFBVA lacks standing because the participation of individual members is necessary to both the claims asserted and the relief requested.  (Defs.' Mem. in Supp. at 18–21.)  The United States Supreme Court has held that requests for injunctive and declaratory relief, as opposed to requests for money damages, do not typically require participation by the individual members. *See Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988).  The Fourth Circuit has also distinguished injunctive and declaratory relief from suits for money damages, which "would require examination of

18

each member's unique injury" to determine the correct amount of damages. *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007). Where an association seeks only declaratory or injunctive relief, the remedy is presumed to "inure to the benefit of those members of the association actually injured" such that "associational standing is virtually always present." *Va. Hosp. & Healthcare Ass'n v. Roberts*, No. 3:20-cv-587, 2023 WL 3132005, at *9 (E.D. Va. Apr. 27, 2023) (quoting *Warth*, 422 U.S. at 515) (internal quotations omitted).

Here, the NFBVA only seeks declaratory and injunctive relief for its claims. Although the Individual Plaintiffs will participate in this litigation, their participation is only required for *their* individual claims, not the claims on behalf of the NFBVA. The Individual Plaintiffs' participation as associational members does not affect NFBVA's standing as to its own claims. Thus, the third prong is satisfied because the associational members' participation is not necessary for NFBVA's claims, and, accordingly, it has associational standing in this case.

### B. Federal Rules of Civil Procedure 8 and 10

The VDOC and its officials also argue that Plaintiffs' Complaint does not comply with Rules 8 and 10. (Defs.' Mem. in Supp. at 12, 16.) First, Rule 8 states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and that the allegations in the pleading must be "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). Defendants argue that Plaintiffs have resorted to a "shotgun style of pleading" which "substantially increases the burden on Defendants and the Court to determine which of the many allegations of fact are offered in support of

which claims." (Defs.' Mem. in Supp. at 14.) For example, Defendants assert that

Claims One, Three, and Four allege violations of Title II of the ADA, Rehabilitation Act

("RA"), and the Virginians with Disabilities Act ("VDA") based upon purported denial

of participation in the VDOC's services, programs, and activities. (*Id.* at 13.) They argue

that the Complaint "does not identify which of the alleged facts give rise to each claim."

(*Id.*) Additionally, Defendants argue that Claim Ten suffers from similar deficiencies

because the Complaint alleges a gross negligence claim against the VDOC, Edmonds,

Williams, and Smith but "offers no specific allegations of fact with respect to these

parties." (*Id.* at 13–14.)

Defendants also assert that the Complaint does not comply with Rule 10.

Rule 10(b) provides "[i]f doing so would promote clarity, each claim founded on a

separate transaction or occurrence . . . must be stated in a separate count or defense."

Fed. R. Civ. P. 10(b). They contend that the Complaint does not adequately allege

separate counts based on separate transactions or occurrences. (Defs.' Mem. in Supp. at

16.) Rather, they argue that "the Complaint consolidates all claims that could be asserted

by any Plaintiff under a particular cause of action into combined counts, regardless of

whether the facts giving rise to each claim are related." (*Id.*)

The Court acknowledges that Plaintiffs' Complaint is not a model of clarity and is

certainly not short. Nonetheless, as to the majority of Plaintiffs' claims, the Court finds

that Plaintiffs have alleged them sufficiently enough that dismissal under either Rule 8 or

10 is not appropriate.[14]  A complaint need only "articulate claims with sufficient clarity to

allow the defendant to frame a responsive pleading." *SunTrust Mortg., Inc. v. First*

*Residential Mortg. Servs. Corp.*, No. 3:12-cv-162, 2012 WL 7062086, at *7 (E.D. Va.

Sept. 11, 2012) (internal citation and quotations omitted).  Although Defendants argue at

length about their inability to adequately respond to Plaintiffs' claims, based on the in-

depth responses contained in their sixty-six (66) page Memorandum in Support, the Court

concludes that the Complaint was sufficiently clear in addressing the threshold legal

issues.  Plaintiffs have separated their claims into individual counts and outlined what

conduct relates to what claim, in a manner sufficient for Defendants to respond.

However, as outlined in more detail in the accompanying Final Order, the Court finds

that providing Plaintiffs an opportunity to amend the Complaint for both brevity and

more clarity moving forward is necessary in this case.

> C.  Claim One: Violation of Title II of the Americans with Disabilities Act 42
> U.S.C. § 12131, *et seq.*

Title II of the ADA provides that no qualified individual shall, "by reason of [a]

disability," be denied the benefits of public "services, programs, or activities" or be

subject to discrimination by a public entity.  42 U.S.C. § 12132.  The term "disability" is

defined by the Act to mean a "physical or mental impairment that substantially limits one

or more major life activities," "a record of such an impairment," or "being regarded as

having such an impairment." *Id.* § 12102(1).  The Act further provides that an individual

is "regarded as having" a qualifying impairment "if the individual establishes that he or

---

[14] However, as will be outlined in further detail *infra*, the Court finds that Claims Ten, Eleven,
and Twelve are not adequately pled and fail to state a claim for which relief may be granted.

she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A).

Thus, to state a cause of action under the ADA, an individual must plausibly allege (1) that he has a disability or has been regarded as having a disability; (2) that he is otherwise qualified to receive the benefits provided by a public entity; and (3) that he was denied those benefits or was otherwise discriminated against on the basis of his disability. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018).

The VDOC and its officials first argue that there is no individual liability for a violation of the ADA, and that the VDOC is the only proper party for Plaintiffs' ADA claims. (Defs.' Mem. in Supp. at 23.) However, the cases cited by Defendants for this proposition specifically clarify that the ADA does "not provide for causes of action against defendants in their *individual capacities*." *Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (emphasis added). Defendants construe those holdings to mean that the preclusion of ADA claims against officials in their *individual capacity* also means preclusion of claims against *individuals* in general. That is an overly expansive interpretation of the law.

Here, NFBVA and the individual Plaintiffs bring their ADA claims against the VDOC and its officials in their *official capacity*. Because "a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office," it is "no different from a suit against the State itself." *Will v. Mich.*

22

*Dep't of State Police*, 491 U.S. 58, 71 (1989).[15]  Therefore, NFBVA and the Individual

Plaintiffs can assert their ADA claims against the VDOC and its officials in their official

capacity.

Second, Defendants do not dispute that Plaintiffs have a disability and are

otherwise qualified to receive the benefits of the VDOC's public services, programs, or

activities.  (Defs.' Mem. in Supp. at 26.)  Instead, to establish a claim, Defendants assert

that Plaintiffs must allege specific modifications to the services, programs, and activities

from which the VDOC is excluding them because of their blindness.  (*Id.*)  Defendants

also argue that Plaintiffs failed to state a claim upon which relief may be granted.  (*Id.*

at 22.)

Department of Justice regulations implementing the ADA explain that "[a] public

entity shall make reasonable modifications in policies, practices, or procedures when the

modifications are necessary to avoid discrimination on the basis of disability. . . ."  28

C.F.R. § 35.130(b)(7).[16]  A modification is reasonable if it is "reasonable on its face" or

used "ordinarily or in the run of cases" and will not cause "undue hardship."  *Halpern v.*

*Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (quoting *US Airways,*

*Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)) (internal quotations omitted); *cf. Henrietta*

---

[15] To clarify, these ADA claims are only valid against the VDOC and the VDOC officials for their claims of injunctive or declaratory relief.  Neither states nor state officials acting in their official capacities constitute "persons" under 42 U.S.C. § 1983 when sued for monetary relief, so any damages claims are precluded.  *Will*, 491 U.S. at 71.

[16] To note, these regulations, however, do not require implementation of even reasonable modifications where the "public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

*D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (stating that the burden of establishing the reasonableness of an accommodation is "not a heavy one" and that it "is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits . . .") (internal citation and quotations omitted). Determination of the reasonableness of a proposed modification is generally fact specific. *Halpern*, 669 F.3d at 464.

Although proposal of a reasonable modification is required to *prevail* on an ADA claim, it is not abundantly clear that a reasonable modification must be proposed at the outset to state a claim for relief that survives a Rule 12(b)(6) motion. Nonetheless, it appears that Plaintiffs have alleged sufficient reasonable modifications to survive at this stage of the litigation. Plaintiffs have proposed a litany of reasonable accommodations, including: providing VDOC documents in accessible formats, such as "large print, taped text, accessible electronic format, or Braille;" providing documents in an accessible digital format, meaning a form "that can be read aloud with screen reader (*i.e.*, text-to-speech) software and adjusted in font size, color, and brightness;" providing greater access to SARA machines and text-to-speech software; use of qualified readers to access course materials; and occupational therapy and blindness skills to allow prisoners to access work assignments. (Compl. ¶¶ 77–78, 130, 139–40, 156, 158.)

Additionally, Plaintiffs have also asked for specific accommodations as it relates to the Individual Plaintiffs' disabilities. (*Id.* ¶ 179 ("window and light tinting, sunglasses, a large-screen television, wireless headphones, [and] a Blue-Ray player"), *id.* ¶¶ 191–93 (magnifier, Sharpie marker for writing large print, and prescription glasses), *id.* ¶¶ 194–

24

99 (accessible titler system, shaking the cell door to notify about appointments and mealtimes, a larger television, magnifier, an external keyboard for the JP6 tablet, and a reading light).)

All other claims Defendants have made relating to the reasonableness of Plaintiffs' current accommodations or disputes as to Plaintiffs' current access to written materials and information are largely fact dependent determinations that are not appropriate to assess at this stage of the litigation. Therefore, the Court will not dismiss Plaintiffs' ADA claims against the VDOC and its officials, and Defendants' Motion as to this claim will be denied.

Lastly as to Claim One, Defendants argue that the underlying allegations that support Plaintiffs' joint ADA claim "plainly do not rise to the level of a constitutional violation. Accordingly, VDOC's sovereign immunity is not disturbed and it is immune from suit for money damages in this case." (Defs.' Mem. in Supp. at 30.)

In *Chase*, this Court held "in the context of state prisons, Title II validly abrogates state sovereign immunity and 'creates a private cause of action for damages against the States' only 'for conduct that *actually* violates the Fourteenth Amendment.'" *Chase v. Baskerville*, 508 F. Supp. 2d 492, 506 (E.D. Va. 2007) (Hudson, J.) (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)). There, this Court determined that, although the United States asserted that Title II implicates "a constellation of rights applicable in the prison context," *Georgia*, 546 U.S. at 162 (Stevens, J. concurring), including the Eighth Amendment, the due process guarantees of the Fourteenth Amendment, and the First Amendment rights of free exercise of religion and free speech, it offers little

25

enforcement mechanism for those rights and the policy of judicial restraint in the prison context.[17] *Baskerville*, 508 F. Supp. 2d at 501. "[I]n the prison setting (1) Title II's goal of accessibility and accommodation is generally not congruent with the rights it implicates, and (2) Title II's indiscriminate demand for accommodation and accessibility on pain of money damages is wildly disproportionate to enforcing any constitutional rights." *Id.*

Thus, as far as money damages are concerned under Plaintiffs' ADA claims, the States' sovereign immunity has not been abrogated and Plaintiffs' claims for money damages are barred. Therefore, Plaintiffs are only entitled to declaratory and injunctive relief under Claim One.

### D. Claim Two: Courtney's Retaliation Claim under the ADA

The ADA's retaliation provision provides, in relevant part, that "[n]o person shall discriminate against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). "To establish a *prima facie* retaliation claim under the ADA, a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 145 (4th Cir. 2012) (citing *A Soc'y Without a Name v. Virginia*, 322 F.3d 342, 350 (4th Cir. 2011)).

The VDOC and its officials do not dispute that Courtney engaged in protected conduct—filing a complaint regarding not receiving appropriate accommodations—and

---

[17] In light of *Lane*, it is assumed that Title II constitutes a valid abrogation of the States' sovereign immunity in the prison context where the issue concerns denial of access to the courts. *Tennessee v. Lane*, 541 U.S. 509 (2004). That issue is not implicated by Plaintiffs' claims here.

that he suffered an adverse action—allegedly being subjected to a drug screening despite no history of substance use in prison.  (Defs.' Mem. in Supp. at 35–36.)  As for the third prong, establishing a causal link, the Fourth Circuit has held that "establishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018); *see also Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) (quoting *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir. 1998) ("[V]ery little evidence of a causal connection is required to establish a *prima facie* case [of retaliation].") (italics added))).  Temporal proximity between the conduct complained of and the protected activity can be suggestive of a retaliatory motive. *See Carter v. Bell*, 33 F.3d 450, 460 (4th Cir. 1994).

Here, Courtney has provided sufficient evidence to support an inference that the drug screening was retaliation for engaging in protected activity.  The drug screening was conducted shortly after Courtney sent two (2) separate letters, through counsel, to Defendants Clarke and Talbott complaining of a lack of accommodations.  Prior to being subjected to this drug test, Courtney had never tested positive for illegal drugs on a urinalysis while in VDOC custody.  (Pls.' Mem. in Opp'n at 19.)  At least for purposes of surviving the motion to dismiss, Courtney has pled sufficient temporal proximity to give rise to an inference of retaliation.  Therefore, Courtney has pled a *prima facie* retaliatory ADA claim under Claim Two, and Defendants' Motion as to this claim will be denied.

E.  Claim Three: Violations of the Rehabilitation Act, 29 U.S.C. § 794

Defendants make many of the same arguments to dismiss Claim Three as they do to dismiss Claim One.  Though the ADA and the RA are similar, they are not the same.

*See, e.g., Spencer v. Earley*, 278 F. App'x 254, 261 (4th Cir. 2008) (quoting *Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999) (holding that "'[t]he ADA and [RA] generally are construed to impose the same requirements,' and '[b]ecause the language of the Acts is substantially the same, we apply the same analysis to both.'")).  The difference is, in order "[t]o succeed on a claim under the [RA], the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Halpern*, 669 F.3d at 461–62 (quoting *Baird*, 192 F.3d at 461).  Regardless of these differences, the determination of the underlying violation and whether the exclusion was solely based on the disability still requires a fact intensive inquiry and is not appropriate for dismissal at the Rule 12(b)(6) stage.  Thus, for the same reasons Defendants' Motion as to Claim One will be denied, the Motion as to Claim Three will also be denied.

### F.  Claim Four: Violation of the VDA, Va. Code Ann. § 51.5-40

The VDA provides that no qualified individual with a disability may be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving state financial assistance or under any program or activity conducted by or on behalf of any state agency." Va. Code Ann. § 51.5-40.  As established in support of their ADA and RA claims, the individual Plaintiffs are blind men who, by virtue of their incarceration, are qualified to participate in and benefit from the VDOC's many programs and activities, including communication, employment, the grievance process, and more.  (Compl. ¶ 1.)

The VDOC Defendants first argue that the VDA claim is not sufficiently pleaded by Plaintiffs. (Defs.' Mem. in Supp. at 37.) Again, although Plaintiffs' Complaint is not a model of clarity, they have sufficiently enumerated the many types of discrimination they allegedly faced, (Compl. ¶¶ 291(a)–(e)), and also included facts supporting how and when Plaintiffs experienced those forms of discrimination or exclusion, (*id.* ¶¶ 143–63). As such, Plaintiffs have met the minimum standard of specificity required at this stage.

The VDOC and its officials also challenge this Court's jurisdiction to hear VDA claims. (Defs.' Mem. in Supp. at 37–41.) They argue that sovereign immunity shields Defendants Clarke, Punturi, Miller, Talbott, and Shaw from liability under the VDA. (*Id.*) However, sovereign immunity does not apply under this claim.

The Commonwealth expressly consented to be sued under the VDA, which applies to "any program or activity conducted by or on behalf of any state agency." Va. Code Ann. § 51.5-40. Defendants argue that a condition of this waiver is that Plaintiffs are limited to filing suit under the VDA in state court. (Defs.' Mem. in Supp. at 39.) However, Defendants do not cite a "decision of any court that has concluded [that the language of § 51.5-46] prohibits suits under the VDA in federal court." *Richardson v. Clarke*, No 3:18-cv-23, 2020 WL 4758361, at *7 (E.D. Va. August 17, 2020).[18]

---

[18] Defendants seemingly even concede that "'there are numerous instances in which the federal courts have entertained claims under the VDA.'" (Defs.' Mem. in Supp. at 39 (quoting *Richardson*, 2020 WL 4758361, at *7 (internal citations omitted)). *Richardson* is particularly instructive here because the same defendants—Defendant Clarke and other prison officials—were denied their motion to dismiss the plaintiff's VDA claim. *Richardson*, 2020 WL 4758361, at *7. In denying the motion, this Court rejected the defendants' argument that the VDA's remedies section, on its face, only waived sovereign immunity as to suits in state court. *Id.* In the case at hand, VDOC Defendants provide no additional textual or case law support for their argument and have failed to meet their burden of proving sovereign immunity should apply.

Therefore, the Commonwealth has waived sovereign immunity for VDA claims and there is nothing precluding Plaintiffs from filing their VDA claims in federal court so long as this Court can exercise supplemental jurisdiction over the claims.  Accordingly, Plaintiffs' Claim Four should proceed in its entirety as to all Defendants.

### G.  Claim Seven: Violation of the Eighth Amendment and 42 U.S.C. § 1983

Plaintiffs have volunteered to dismiss the VDOC, Edmunds, Punturi, Marano, and Talbott from Claim Seven.  (Pls.' Mem. in Opp'n at 5 n.5.)  However, Courtney is still pursuing this claim against Armor, VitalCore, and Dr. Gore.  (*Id.*)  VitalCore filed a Motion to Dismiss (ECF No. 46), but Armor and Dr. Gore did not.  For the following reasons, VitalCore's Motion to Dismiss will be granted.

Courtney has brought a § 1983 claim against VitalCore, a private corporation, under a theory of *respondeat superior*.  "A private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999).  A policy is not an abstract concept; a plaintiff must allege a written policy or official custom is the cause of the violation of his or her rights. *See Clark v. Md. Dep't of Pub. Safety & Corr. Services*, 316 F. App'x 279 (4th Cir. 2009); *Harrison v. Oakley*, No. RDB-7-2468, 2008 WL 7836410 (D. Md. June 25, 2008) *aff'd*, 328 F. App'x 847 (4th Cir. 2009) (dismissing two (2) corporations contracted to provide inmate medical services in the absence of any allegation that official policies or customs of the corporations caused the alleged constitutional violations).

*Washington v. Brooks* lays out the circumstances in which policy or custom liability can arise:

> Policy or custom liability can arise in four instances: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with force of law.

No. 3:20-cv-88, 2022 WL 89171, at *9 (E.D. Va. Jan. 7, 2022) (Hudson, J.) (citing *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal citations and quotations omitted)). Even a single action taken by a decisionmaker can constitute a policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). However, the key inquiry is whether "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* "[W]hen a subordinate official's decisions are subject to review by someone else, the subordinate official's decisions cannot be considered 'policy.'" *Washington*, 2022 WL 89171, at *9.

In *Washington*, a prisoner brought a § 1983 claim against Armor, the medical service provider for the correctional facility, based on actions taken by the medical director of the correctional institution. *Id.* at *1. This Court held that such an allegation was not a sufficient basis for a claim against Armor, stating "[d]iscretionary decisions must be *final* in that they are not constrained by policies not of that official's making and not subject to review by the municipality's authorized policymakers." *Id.* at *10 (internal citations and quotations omitted) (emphasis in original). This Court reasoned that because the medical director's decisions were constrained by the VDOC and Armor's policies, the medical director was not the final decisionmaker. *Id.*

31

Here, Courtney alleges VitalCore is responsible for the actions of Dr. Gore under a theory of *respondeat superior*. VitalCore is a private corporation and thus, *respondeat superior* cannot provide a basis for recovery under a § 1983 claim absent a showing that the complained of actions are a result of a policy, custom, or procedure. Courtney fails to allege that any official, written policy or custom of the treating providers or VitalCore caused the alleged violation of his constitutional rights here. Even assuming this argument could be made, Courtney complains about the medical care he received from Dr. Gore, the medical director at Greensville. (Compl. ¶¶ 230–38.) Dr. Gore's actions are certainly constrained by the polices of the VDOC and VitalCore and, thus, he cannot be considered a "final decisionmaker" on behalf of VitalCore. Accordingly, Courtney's claim against VitalCore will be dismissed with prejudice.

### H.  Claim Eight: Stravitz's Eighth Amendment Claim under 42 U.S.C. § 1983

#### 1. VitalCore:

Stravitz volunteered to dismiss the VDOC Defendants and Defendants Miller and Willams from this claim. (Pls.' Mem. in Opp'n at 5 n.5.) However, he insists on pursuing his claim against the remaining Defendants—VitalCore, Dr. Harris,[19] and Dr. Gupta. *Id.*

Just like Claim Seven, Stravitz's claim against VitalCore is based on a theory of *respondeat superior*, which cannot provide a basis for recovery against a private corporation in a § 1983 action unless it is based on an official policy, custom, or

---

[19] Dr. Harris did not file a Motion to Dismiss in this case.  Thus, Claim Eight as to Dr. Harris is unaffected.

procedure. Again, even a single action taken by a "decisionmaker" can constitute a policy. Here, Stravitz alleges VitalCore is responsible for the actions of Dr. Harris under a theory of *respondeat superior*. Stravitz fails to allege that any official, written policy or custom of the treating providers or VitalCore caused the alleged violation of his constitutional rights. Further, Stravitz complains of the medical care he received from Dr. Harris, the medical director at Deerfield. (Compl. ¶¶ 245–46.) Dr. Harris' actions are constrained by the policies of the VDOC and VitalCore and, thus, he cannot be considered a "final decisionmaker" on behalf of VitalCore. Accordingly, as to VitalCore, Claim Eight will be dismissed with prejudice.

     2. Dr. Gupta:

As to Stravitz's Eighth Amendment claim against Defendant Dr. Gupta, Dr. Gupta asserts that Stravitz fails to state a claim because he alleges no facts which establish that Dr. Gupta violated his Eighth Amendment rights. (Dr. Gupta's Mem. in Supp. at 4, ECF No. 43.)

An Eighth Amendment claim for deliberate indifference to a serious medical need requires a plaintiff to show: (1) that their medical needs were serious—the objective prong; and (2) that the defendant knew about and ignored "an excessive risk to [the] inmate['s] health or safety"—the subjective prong. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Dr. Gupta contends that neither prong is met in this case. (Dr. Gupta's Mem. in Supp. at 6.)

"The objective component of a deliberate indifference claim is satisfied by a serious medical condition." *Gordon v. Schilling*, 937 F.3d 348, 357 (4th Cir. 2019)

(citing *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)).  A medical condition is serious when it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal citation and quotations omitted).

Stravitz clearly alleges, and Dr. Gupta does not dispute, that Dr. Gupta diagnosed Stravitz's cataracts as needing surgery. (Compl. ¶ 240.)  Stravitz further alleges that "his vision is getting progressively worse, leading to increased discomfort, mental anguish, and emotional distress." (*Id.* ¶ 247.)  He alleges that his cataracts will "jeopardize[] his vision" such that failure to treat them will cause "further vision loss, physical discomfort, depression [and] anxiety." (*Id.* ¶¶ 335, 339.)  Thus, Stravitz has sufficiently alleged that his medical needs are serious enough to meet the first prong at this stage.

As to the second subjective prong, a plaintiff must show that the defendant "knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citing *Farmer* 511 U.S. at 837) (internal quotations omitted).  The Fourth Circuit has held that "prison doctors violate the Eighth Amendment if they decline to provide the level of care they deem medically necessary." *Goodman v. Johnson*, 524 F. App'x 887, 889 (4th Cir. 2013).  The failure to respond to an inmate's known medical needs "raises an inference of deliberate indifference to those needs." *Id.* (citing *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986)).

Stravitz alleges he was first diagnosed with cataracts in the fall of 2021. (Compl. ¶ 239.)  In March 2022, Dr. Gupta verified that diagnosis and told Stravitz that he would

34

schedule him for surgery to remove the cataracts. (*Id.* ¶ 240.)  Although Stravitz has

repeatedly requested that this surgery be scheduled, it has not been scheduled as of April

2023—allegedly over a year after the visit with Dr. Gupta and nearly eighteen (18)

months after his initial diagnosis. (*Id.* ¶ 241.)  Dr. Gupta implies that his failure to

schedule Stravitz for surgery after the March 2022 follow-up appointment lies with the

VDOC and its employees, and he also disclaims any knowledge of their actions. (Dr.

Gupta's Mem. in Supp. at 6–7.)  However, these are disputes of fact and cannot be

resolved at the motion to dismiss stage.  Accordingly, although Stravitz's Eighth

Amendment claim is not a model of clarity, it alleges enough to survive a Motion to

Dismiss and should continue as to Dr. Gupta.

I. Claims Ten, Eleven, and Twelve: Gross Negligence and Negligence

Under Claims Ten, Eleven, and Twelve, Plaintiffs allege gross negligence and

negligence. (Compl. ¶¶ 353–74.)  "The difference between ordinary negligence and

gross negligence is one of degree[.]"  *Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005).

"Simple negligence is the failure to use the degree of care an ordinary person would

exercise to avoid injury to another."  *Harris v. Harman*, 486 S.E.2d 99, 101 (Va. 1997).

"[G]ross negligence is 'that degree of negligence which shows indifference to others as

constitutes an utter disregard of prudence amounting to a complete neglect of the safety

of [another].  It must be such a degree of negligence as would shock fair minded [people]

although something less than willful recklessness.'"  *Green*, 608 S.E.2d at 922 (quoting

*Ferguson v. Ferguson*, 181 S.E.2d 648, 653 (Va. 1971)).

The Court concludes that Claims Ten, Eleven, and Twelve are simply legal conclusions and do not set forth factual allegations sufficient to state a claim. Plaintiffs tie the allegedly unlawful conduct to "Defendants" generally without pointing to specific instances of conduct that constitute negligence. For example, under Claim Ten, Plaintiffs allege that "Defendants have failed to comply with professional standards in the treatment, care, and supervision of blind prisoners, including the Individual Plaintiffs, during their incarceration." (Compl. ¶ 354.) They further allege that those failures include: "failing to provide [Stravitz] and [Courtney] with timely and necessary medical treatment; falsifying [Courtney's] drug test; failing to provide reasonable accommodations and appropriate auxiliary aids to all Plaintiffs; and denying all Plaintiffs access to programs and services at Deerfield and Greensville, respectively." (*Id.* ¶ 355.) In no way does this point to which specific Defendants committed any of these alleged failures. Instead, Plaintiffs allege negligence generally against the Defendants contained within the Claim's subheading. This is insufficient. Merely providing a recitation of the elements of a cause of action will not suffice to establish a claim. Claims Ten, Eleven, and Twelve all suffer this deficiency. Accordingly, Defendants' Motions to Dismiss as to those three Claims will be granted, and Claims Ten, Eleven, and Twelve will be dismissed without prejudice.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motions will be granted in part and denied in part.  An Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: Oct. 16, 2023
Richmond, VA

37