# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

THE NATIONAL FEDERATION OF          )
THE BLIND OF VIRGINIA, *et al.*,     )
                                     )
      Plaintiffs,              )
                                     )
v.                                   )    Civil Action No. 3:23-cv-127–HEH
                                     )
VIRGINIA DEPARTMENT OF               )
CORRECTIONS, *et al.*,               )
                                     )
      Defendants.              )

## MEMORANDUM OPINION
### (Resolving Cross-Motions for Summary Judgment)

THIS MATTER is before the Court on cross-motions for summary judgment.

Plaintiffs National Federation of the Blind of Virginia ("NFBVA"), Nacarlo Antonio

Courtney ("Courtney"), William Landrum Hajacos ("Hajacos"), Michael McCann

("McCann"), Kevin Muhammad Shabazz ("Shabazz"), Patrick Shaw ("Shaw"), and

William Stravitz ("Stravitz") (collectively, "Plaintiffs") filed their Motion for Partial

Summary Judgment (ECF No. 189) on February 23, 2024, and Defendant Virginia

Department of Corrections[1] ("Defendant" or "VDOC") filed its Motion for Summary

Judgment (ECF No. 209) on March 1, 2024.

Plaintiffs in this case include the NFBVA, on behalf of current and future blind

inmates within the custody of the VDOC, and six (6) Individual Plaintiffs who bring

---

[1] When Defendant initially filed its Motion for Summary Judgment, multiple VDOC employees were involved in this case as defendants. Since then, the Court has dismissed the other VDOC defendants as redundant, leaving only the VDOC. (*See* Mem. Op. at 4–5, ECF No. 252; Mem. Order at 2, 4–5, ECF No. 272.)

claims based on their own individual and unique blindness.  Plaintiffs allege that Defendant violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") by failing to accommodate Plaintiffs' blindness.  (Am. Compl. ¶¶ 174–83, 189–99, ECF No. 136.)  Two (2) claims remain: Count I – Plaintiffs' equal access claim under the ADA, and Count III – Plaintiffs' claim for Violation of Section 504 of the RA. (*Id.*)

The parties filed extensive memoranda in support of their respective positions. The Court heard oral argument on April 11, 2024.  For the reasons that follow, the Court will deny Plaintiffs' Motion for Partial Summary Judgment and will grant in part Defendant's Motion for Summary Judgment.

## I. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Once a motion for summary judgment is properly raised and supported, the opposing party bears the burden of showing that a genuine dispute of material fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248. Neither a scintilla of evidence in support of the nonmoving party nor conclusory allegations or denials, without more, are sufficient to withstand a summary judgment motion. *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).

Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50) (internal quotations omitted). When applying the summary judgment standard, courts "must construe the facts in the light most favorable to [the nonmoving party] and [] may not make credibility determinations or weigh the evidence." *Id.* at 213 (citations omitted).

## II. BACKGROUND

As required, the Court resolves all genuine disputes of material fact in favor of the nonmoving party and disregards immaterial factual assertions. *Anderson*, 477 U.S. at 248, 255. Applying this standard, the Court concludes that the following narrative represents the facts in this case.[2]

### A. Individual Plaintiffs

Plaintiffs are five (5) current VDOC inmates, one (1) former VDOC inmate, and one (1) non-profit organization. (Pls.' SUF ¶¶ 4, 6, 8, 10, 12, 14, 16.) Of the six (6) Individual Plaintiffs, Hajacos is currently incarcerated at Greensville Correctional Center ("Greensville") while McCann, Shabazz, Shaw, and Stravitz are currently incarcerated at Deerfield Correctional Center ("Deerfield"). (*Id.* ¶¶ 6, 8, 10, 12, 14.) Courtney was previously incarcerated at Greensville but has since been released. (*Id.* ¶ 4.) Each of the Individual Plaintiffs suffer from varying degrees of blindness. (*Id.* ¶¶ 5, 7, 9, 11, 13, 15.)

#### 1. Plaintiff Courtney (Greensville)

Courtney's blindness is caused by keratoconus. (*Id.* ¶ 5.) Courtney was transferred from Sussex II to Greensville and, after that transfer occurred, Greensville did not provide some of the accommodations that Sussex II provided for him. (Courtney Dep. at 58:12–21, 85:15–86:15, 157:4–160:1, ECF No. 210-4.) Additionally, Courtney

---

[2] The Court cites to either the statement of undisputed facts ("SUF") contained in Plaintiffs' or Defendant's briefing wherever appropriate. (Pls.' Mem. in Supp. at 3–15, ECF No. 200; Def.'s Mem. in Supp. at 3–42, ECF No. 210.) Otherwise, the Court cites directly to the exhibits submitted by the parties.

was denied accommodations that he requested while involved in the prison's re-entry program. (*Id.* at 153:4–155:6.)

### 2. Plaintiff Hajacos (Greensville)

Hajacos has a condition called Usher syndrome, which causes hearing impairment and blindness. (Pls.' SUF ¶ 6.) Because of his inability to read and write, Hajacos has sometimes paid other prisoners to read and write for him. (*Id.* ¶ 21.) Beginning in 2019, Hajacos worked in the Wood Shop at Greensville. (Def.'s SUF ¶ 120.) Due to the COVID-19 outbreak, the VDOC required all Wood Shop employees to be housed in the same unit in order to mitigate the spread of the virus. (*Id.* ¶ 121.) Hajacos refused to move housing units because he was uncertain whether he would receive all the accommodations that the VDOC provided for his disabilities in his current housing unit. (*Id.* ¶ 124; Hajacos Dep. at 56:14–57:22, 63:19–66:21, ECF No. 210-2.) Because Hajacos would not move housing units, he was terminated from the Wood Shop position in 2021. (Def.'s SUF ¶ 124–25.) Hajacos was also enrolled in a computer class periodically beginning in 2018. (*Id.* ¶ 130.) Though Hajacos was provided magnifying eyeglasses for the class, he maintains that they were not adequate to allow him to see the computer screen and that he received no other accommodations. (Suppl. Hajacos Decl. ¶¶ 15–16, ECF No. 235-19.)

### 3. Plaintiff McCann (Deerfield)

McCann is blind due to a condition called retinitis pigmentosa. (Pls.' SUF ¶ 9.) McCann is assigned a Caregiver who assists him with reading, writing, navigating, and other tasks. (Def.'s SUF ¶ 201.) McCann requested that his Caregiver be moved to the

bed next to him and, initially, his request for accommodation was denied. (*Id.* ¶ 202.) However, at some point after the request was denied, his Caregiver was moved to the bed next to him. (*Id.*) McCann asserts that not having his Caregiver with him has caused multiple issues. He states that he was forced to drop out of a horticulture class because his Caregiver was not permitted to attend with him. (*Id.* ¶ 213.) Additionally, McCann has bumped into other prisoners when his Caregiver was not with him, causing altercations. (*Id.* ¶ 204.) McCann also states that there was an incident where he was attacked by other inmates in the bathroom, and the VDOC refused to investigate because he was unable to identify his attackers. (*Id.* ¶ 207.)

The VDOC makes JPay tablets, which are touch-screen tablets similar to iPads, available to all prisoners. (Pls.' SUF ¶¶ 44–45.) These tablets are the only way that inmates can send and receive emails. (*Id.* ¶ 47.) The tablet screens are generally no larger than a half sheet of paper. (*Id.* ¶ 59.) McCann struggles to use the JPay tablets. (*Id.* ¶ 45.) The tablets have a smooth surface, which makes it difficult for McCann to navigate and causes McCann to ask his Caregiver to draft emails for him. (*Id.*; McCann Decl. ¶ 7, ECF No. 191-5.) The VDOC also provides JPay kiosks that allow inmates to send and receive emails after they connect their tablets to the kiosks. (Pls.' SUF ¶¶ 48–49.) However, the kiosks do not have assistive technology that would allow inmates to enlarge the text on the screen. (McCann Decl. ¶ 13.) Because of this, McCann is forced to use his handheld magnifier while using the kiosk, which strains his eyes and impedes his ability to read and write emails at the kiosk. (*Id.*) Further, the keyboards on the kiosks lack markings that would assist McCann in typing. (*Id.* ¶ 12.)

In November 2022, McCann requested that the VDOC provide a clear, marked pathway in his housing unit to enable him to navigate more effectively. (Pls.' Opp'n Ex. 45 at 2, ECF No. 235-45.)[3] In reponse to this request, the VDOC placed textured tape on the floor of various areas in his housing unit so that he could use it to navigate by feel. (Def.'s SUF ¶¶ 209–10.) However, McCann states that the tape is regularly damaged by other people and that it sometimes takes the VDOC weeks to repair it. (McCann Dep. at 60:21–62:4, ECF No. 210-3.) McCann complains of various other failures to accommodate, including that the VDOC will not allow McCann to perform the duties of his job assignment and that one of his grievances was rejected because he used a sharpie pen to write in large print and attached an additional piece of paper. (Def.'s SUF ¶¶ 199, 214, 216.)

### 4. Plaintiff Shabazz (Deerfield)

Shabazz's blindness was caused by a gunshot wound to the face and he is completely blind. (Pls.' SUF ¶ 11; Shabazz Decl. ¶¶ 2–5, ECF No. 191-27.) Employment at Deerfield is based on job availability and, when a job is available, inmates may submit applications for consideration. (Def.'s SUF ¶ 156.) Shabazz is currently employed in the laundry department. (*Id.* ¶ 155.) Shabazz has applied for multiple other jobs throughout the years, but he has not been hired for these positions. (*Id.* ¶¶ 157–59.) He believes that his applications were denied because he was blind. (Pls.' Opp'n at 50, ECF No. 232.)

---

[3] When citing to the parties' exhibits, the Court employs the pagination assigned by the CM/ECF docketing system.

While in prison, Shabazz took General Equivalency Diploma ("GED") classes. (Def.'s SUF ¶ 144.)  Despite receiving multiple accommodations, including a laptop with Job Access With Speech ("JAWS") software[4] and Typeability software, a talking dictionary, and a talking calculator, Shabazz states that he did not receive any tactile graphics and that the accommodations were not available to him when he first started the class. (Shabazz Dep. at 31:5–16, ECF No. 210-6.)  Shabazz received his GED on August 23, 2023. (Def.'s SUF ¶ 143.)  Shabazz also took a computer literacy class while incarcerated. (*Id.* ¶ 148.)  Though Shabazz was able to use a screen reader, he states that the screen reader had a lot of glitches, and that he was unable to take the tests while in the class. (Shabazz Dep. at 36:24–37:13.)

Deerfield has a Scanning and Reading Appliance ("SARA")[5] in the law library that blind inmates can use. (Def.'s SUF ¶ 153.)  Shabazz has access to the SARA machine every day of the week for at least an hour. (*Id.* ¶ 154.)  However, there is no SARA machine in Shabazz's housing unit, and this limits the amount of time that he can read, compared to other inmates. (Shabazz Decl. ¶ 12.)  Shabazz has asked the VDOC to install a JAWS screen reader on a law library computer, but such software has not been installed. (Pls.' SUF ¶ 34; Pls.' Opp'n Ex. 104 at 2, ECF No. 237-45; Pls.' Opp'n Ex. 105 at 2, ECF No. 237-46.)  Finally, Shabazz requested that the VDOC provide accessibility features for his JPay tablet, and his request was denied. (Pls.' Ex. 41 at 2–3,

---

[4] JAWS is a commercially available screen reader software. (Pls.' SUF ¶ 18.)

[5] SARA scanners scan and read aloud printed materials. (Pls.' SUF ¶ 20.)

ECF No. 194-15; Pls.' Ex. 47 at 2–3, ECF No. 194-20; Pls.' Ex. 48 at 2, ECF No. 194-21.) Because of the tablet's smooth screen, Shabazz is unable to navigate it and asks other inmates for assistance with reading and writing. (Shabazz Decl. ¶ 17.) Shabazz is also unable to use some of the JPay kiosks because the keyboards do not have markings on the keys to distinguish them. (*Id.* ¶ 19.)

### 5. Plaintiff Shaw (Deerfield)

Shaw suffers from a condition called uveitis, which causes his blindness. (Pls.' SUF ¶ 13.) Because of his inability to read and write, Shaw has sometimes paid other prisoners to read and write for him. (*Id.* ¶ 21.) While at Deerfield, Shaw was placed on the waiting list for a computer class and, approximately a year and a half later, was notified that he was enrolled in the class. (Def.'s SUF ¶¶ 172–73.) However, Shaw withdrew from the class because his Caregiver was unable to accompany him. (Shaw Dep. at 75:6–24, 86:13–16, ECF No. 210-1.)

Shaw has not held a job at Deerfield since 2007, nor has he spoken to his counselor about the availability of jobs. (Def.'s SUF ¶¶ 179, 181.) Additionally, he is housed in a dorm-style pod and has hit his head twice on the top bunk. (*Id.* ¶¶ 184, 187.) The first time was over four (4) years ago, and Shaw sustained a cut on his head that required a bandage. (*Id.* ¶ 187.) The second time was on November 24, 2023, and Shaw sustained a nosebleed. (*Id.* ¶ 188.)

Shaw has a JPay tablet but is unable to use it in the same way that other inmates do because of his blindness. (Shaw Dep. at 40:3–8.) He struggles to use the tablet without help and it is not equipped with screen reader software. (*Id.* at 41:4–24.)

### 6. Plaintiff Stravitz (Deerfield)

Stravitz suffered from cataracts which caused his blindness. (Pls.' SUF ¶ 15.)[6]  In 2022, Stravitz began working as a library assistant in the Deerfield education library, which is a Grade 3 job.  (Def.'s SUF ¶ 162.)  Stravitz struggled to complete some of his work because the glare from the computer screen made it very difficult to read.  (Stravitz Dep. at 33:18–34:13, ECF No. 210-5.)  Though the VDOC provided him a magnifier and a piece of translucent paper to reduce the glare, Stravitz states that this only made his ability to read "a little bit better but that [] lens didn't do much." (*Id.* at 86:10–22.)

### B. VDOC Facilities and Procedures

Both Greensville and Deerfield have a law library and an education, or recreational, library.  (Pls.' SUF ¶¶ 22, 36.)  None of the computers at these libraries have commercially available screen reader software installed.  (*Id.* ¶¶ 23, 38.)  However, the Greensville law library computers have both a narrator and magnification function.  (Phillips Dep. at 94:15–20, 127:2–8, ECF No. 191-24.)  The Deerfield law library has a SARA machine available for blind inmates to use.  (Pls.' SUF ¶ 30.)

The VDOC has established a grievance procedure for inmates that is governed by Operating Procedure ("OP") 866.1.  (Def.'s SUF ¶ 87.)  It requires inmates to initiate the grievance process by filing a Written Complaint.  (OP § II(B), ECF No. 210-24 at 54–70.)  If inmates are dissatisfied with the resolution of the Written Complaint, they can file a Regular Grievance.  (Def.'s SUF ¶ 90.)  If the Regular Grievance is rejected because it

---

[6] In October 2023, Stravitz underwent surgery for his cataracts and no longer suffers from any vision impairment.  (Def.'s SUF ¶ 167.)

does not meet filing requirements, it is returned to the inmate along with the reason for the return. (*Id.* ¶ 91.) For Regular Grievances involving disability accommodations, once they are accepted, there are two (2) levels of review. (*Id.* ¶ 92.) The initial response to the grievance is a Level I response. (OP § III(F)(1).) Once an inmate receives a Level I response, they may appeal it and will then receive a final review, which is Level II. (*Id.* § IV; Def.'s SUF ¶ 92.)

In 2022, OP 866.1 was amended to require inmates to attach their Request for Reasonable Accommodation form to any Regular Grievance related to a failure to accommodate a disability. (Def.'s SUF ¶ 90; OP § III(B)(6)(f).) The grievance process is paper-based—the forms and responses are hard-copy documents. (Pls.' SUF ¶ 62.) The forms are in standard print but can be provided in large print on a case-by-case basis. (*Id.* ¶ 66.)

## III. DEFENDANT'S MOTION

Defendant makes three (3) primary arguments in its Motion: that Plaintiffs' claims should be dismissed because (1) they are not properly exhausted; (2) they are beyond the statute of limitations; and (3) they are meritless. (Def.'s Mem. in Supp. at 1–2, ECF No. 210.) The Court will address each argument in turn.

### A. Prison Litigation Reform Act Exhaustion

Defendant argues that Plaintiffs have failed to exhaust all but five (5) of their ADA claims. (*Id.* at 45.) Under the Prison Litigation Reform Act ("PLRA"), inmates are required to exhaust their available administrative remedies prior to filing a lawsuit. 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534

U.S. 516, 524 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

Because failure to exhaust is an affirmative defense, the initial burden lays with Defendant to show that Plaintiffs did not exhaust their claims. *Bock*, 549 U.S. at 216. Once a defendant has presented evidence of a failure to exhaust, the plaintiffs must show, by a preponderance of the evidence, that their claims were either exhausted or that the grievance process was unavailable to them. *Lordmaster v. Augusta Corr. Ctr. Pers.*, No. 7:13-cv-506, 2014 WL 3359389, at *1 n.2 (W.D. Va. July 9, 2014) (citation omitted).

Plaintiffs do not dispute that many of their claims were not properly exhausted. Instead, Plaintiffs respond to Defendant's exhaustion argument with four (4) separate arguments. They first argue that Defendant has not met its evidentiary burden to show that Plaintiffs failed to exhaust their administrative remedies. (Pls.' Resp. in Opp'n at 33–35.) Second, they argue that the grievance procedure was unavailable to Individual Plaintiffs because it was not effectively communicated to them. (*Id.* at 35–40.) Third, they assert that Defendant thwarted Plaintiffs' ability to use the grievance process. (*Id.*

at 40–43.)  Finally, Plaintiffs contend that Defendant is attempting to improperly narrow

the scope of Plaintiffs' exhausted claims.  (*Id.* at 44–45.)

### 1. Defendant's Evidentiary Burden

The evidence that Defendant provides to meet its burden regarding exhaustion is

questionable.  Defendant primarily relies on declarations by VDOC staff that examine

Plaintiffs' Grievance Files and Grievance Reports.  (Def.'s Mem. in Supp. at 46, 50, 52,

54–57.)  However, Plaintiffs argue that the information in the Grievance Files and

Grievance Reports is inaccurate.  (Pls.' Opp'n at 33–35.)

Upon review, the information in the Files and Reports appears to be inconsistent

with Plaintiffs' testimony.  For example, Defendant asserts that Shabazz only filed one

Written Complaint with regard to his request for JPay tablet accommodations in

November 2022, but Shabazz's Written Complaint filed in December 2022 goes

unmentioned.  (DeBerry Decl. ¶ 22, ECF No. 210-24; Pls.' Opp'n Ex. 68, ECF No. 237-

24.)  Similarly, Defendant states that Courtney did not file a Regular Grievance related to

his Written Complaint filed in 2022 requesting a dimmer light in his cell.  (Phillips Decl.

¶ 16, ECF No. 210-22.)  Conversely, Courtney states that he submitted a grievance and

"appeal[ed] [it] all the way up" after he first arrived in Greensville in 2021.  (Courtney

Dep. at 159:3–161:17.)  Similar issues abound throughout the depositions proffered by

Defendant.  At minimum, a question of fact exists as to the accuracy of the VDOC's

Grievance Files and Grievance Reports.

## 2. Unavailability Due to Lack of Effective Communication

Even assuming Defendant met its burden, there is a question of fact as to whether the grievance process was available to Individual Plaintiffs. The grievance forms that Plaintiffs were required to complete were generally only available in standard print. (Cosby Dep. at 22:11–23:1, ECF No. 235-26; Talbott Dep. at 173:14–174:2, ECF No. 235-5.) Plaintiffs assert that VDOC staff were not able or willing to help them complete grievance forms. (Pls.' Opp'n at 39–40.) Because Plaintiffs were not able to complete the grievance forms on their own, they assert that the forms were unavailable to them. (*Id.* at 36.)

When addressing the PLRA exhaustion requirement, the Seventh Circuit noted the following:

> [I]f a prison had a procedure whereby written grievance forms were provided to all inmates and they were required to fill them out without any assistance from others, that procedure might render the grievance remedy available for the majority of inmates, but the same procedure could render it unavailable for a subset of inmates such as those who are illiterate or blind, for whom either assistance or a form in braille would be necessary to allow them to file a grievance.

*Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018). The District Court of Maryland took a similar approach and stated that blind inmates "may forego ordinary exhaustion requirements by demonstrating that they were unable to read the print-only grievance materials or that they otherwise had no ability to use the grievance procedures." *Brown v. Dep't of Pub. Safety & Corr. Servs.*, 383 F. Supp. 3d 519, 543–44 (D. Md. 2019).

The Fourth Circuit has not directly addressed when a grievance procedure is unavailable to blind inmates.  However, the Fourth Circuit has laid out three (3) circumstances where a remedy is unavailable:

> (1) where the remedy "operates as a simple dead end," with prison officials "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where an administrative scheme is "so opaque" that it is "practically ... incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Griffin v. Bryant*, 56 F.4th 328, 335 (4th Cir. 2022) (quoting *Ross v. Blake*, 578 U.S. 632, 643–44 (2016)).  Though Plaintiffs' situation does not fall neatly into any of these categories, it most resembles the first scenario, where the grievance procedure operates as a dead end.  The VDOC has established a grievance procedure that would be available to Plaintiffs if VDOC staff were available to assist them in completing the grievance forms.  However, there is a dispute of fact as to whether VDOC staff *is* available to assist blind prisoners with completing grievance forms.  If staff is unavailable, blind prisoners are left to fill out hard copy, standard print grievance forms with no assistance, rendering the grievance process effectively a dead end.  Thus, the Court must evaluate each Individual Plaintiff and determine whether they required assistance and were provided assistance when filling out grievance forms.

Defendant asserts that there is no evidence that Stravitz ever attempted to file a complaint or grievance for any of his claims.  (Def.'s Mem. in Supp. at 55.)  Though Plaintiffs do not directly address this contention, in one of their responses to Defendant's SUF, they state that Stravitz filed at least two (2) Written Complaints about his cataract

surgery. (Pls.' Opp'n at 25.) These complaints were not rejected, but, instead, were responded to by the VDOC. (Pls.' Opp'n Ex. 55 at 2, ECF No. 237-15; Pls.' Opp'n Ex. 71 at 2, ECF No. 237-25.)[7] There is no evidence that Stravitz filed or ever attempted to file a grievance relating to his concerns that he would be fired from his library job. Additionally, Stravitz does not contend that he had any issues filing grievance forms or that he was forced to ask other prisoners to assist him in filing grievance forms. Based on this evidence, the grievance process appears to have been available to him. Accordingly, the Court will grant Defendant's Motion as to Stravitz.

Similarly, Courtney does not allege, nor does he testify, that he was unable to utilize the grievance procedure because he was unable to read the forms. In fact, the parties agree that Courtney submitted multiple Written Complaints and he testifies that he filed a Regular Grievance, which he appealed. (Phillips Decl. ¶¶ 16–18; Courtney Dep. at 159:3–161:17.) Likewise, McCann also utilized the grievance procedure regularly, submitting multiple Written Complaints and Regular Grievances almost every month.

---

[7] In a lone paragraph, Defendant argues that the evidence Plaintiffs attach to their Motion and their Opposition should not be considered because it is not properly authenticated by an affidavit and, therefore, violates Rule 56. (Def.'s Reply at 1–2, ECF No. 251.) However, the case Defendant cites for this proposition was decided in 1999. *See generally Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669 (D. Md. 1999), *aff'd*, 213 F.3d 632 (4th Cir. 2000). In 2010, Rule 56 was amended and, "[u]nder the current version of Rule 56 . . ., [] facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the new requirement is that the party identifies facts that *could be* put in admissible form." *Jones v. W. Tidewater Reg'l Jail*, 187 F. Supp. 3d 648, 654 (E.D. Va. 2016) (internal quotations and citation omitted) (emphasis in original). Though Plaintiffs' evidence is not currently in an admissible form, it could be admissible if authenticated. Because Defendant does not otherwise challenge the admissibility of Plaintiffs' evidence, and because there is no apparent reason why Plaintiffs could not authenticate the evidence if required to do so, the Court will consider the evidence attached to both Plaintiffs' Motion and their Opposition. *See Id.*

(*See* DeBerry Decl. at Enclosure E.)  McCann also does not allege that he was unable to complete the grievance forms, and his Caregiver was available to assist him with reading and writing.  Many of the grievances related to requests for accommodation of their disabilities were accepted and responded to by the VDOC.  This indicates that the grievance process was not unavailable to Courtney and McCann due to a lack of staff assistance.

This leaves Shabazz and Hajacos.[8]  Both Shabazz and Hajacos submitted multiple Written Complaints and Regular Grievances.  (*See* DeBerry Decl. at Enclosure C; Phillips Decl. at Enclosure C.)  However, Shabazz testifies that he cannot write and has to ask other inmates to read and complete grievance forms for him.  (Shabazz Dep. at 11:5–14, 13:2–18.)  Similarly, Hajacos testifies that he has paid other inmates to read and write for him.  (Hajacos Dep. at 8:10–9:7; 146:18–23.)  Based on this testimony, there is a question of fact as to whether the grievance procedure was available to Shabazz and Hajacos. *See Hill v. O'Brien*, 387 F. App'x 396, 401 (4th Cir. 2010) (finding that relying on an inmate's large number of filings alone to show availability of the grievance procedure is inappropriate).

Plaintiffs also argue that the amendment to OP 866.1 in 2022 rendered the grievance procedure unavailable to blind inmates.  (Pls.' Opp'n at 37–40.)  Though inmates are informed about OP 866.1 at orientation, they are not provided copies of it. (*Id.* at 37.)  Inmates can access the policy in the law library, but it is only available in

---

[8] Shaw will not be addressed because his claims will be dismissed as untimely under the statute of limitations. *See infra* § III.B.

standard print. (*Id.*) Further, Plaintiffs assert that, when OP 866.1 was amended in 2022, the VDOC did not specifically inform blind inmates and, at most, posted a standard-print memo on the announcement board. (*Id.* at 38.) Plaintiffs state that this lack of communication caused both Shabazz and McCann to be unable to correctly file multiple grievances. (*Id.* at 38–39.)

Plaintiffs outline two (2) instances of Shabazz's grievances being rejected because he did not attach a Request for Reasonable Accommodation. (*Id.* at 39; Pls.' Opp'n Ex. 50 at 3, ECF No. 237-13; Pls.' Opp'n Ex. 51 at 3, ECF No. 237-14.) Likewise, Plaintiffs only cite two (2) of McCann's grievances, filed on the same day, that were rejected for failing to attach the accommodation request. (Pls.' Opp'n at 39; Pls.' Opp'n Ex. 44 at 3, ECF No. 237-8; Pls.' Opp'n Ex. 45 at 3.) Further, Shabazz was sent a letter informing him of the new requirement that he must attach a Request for Reasonable Accommodation to any disability-related Regular Grievances that he files, and McCann successfully filed and exhausted a disability-related Regular Grievance in 2023, after the amendment. (Suppl. DeBerry Decl. at Enclosure C, ECF No. 219-1; DeBerry Decl. ¶ 39.) This evidence is insufficient to show that the grievance process was unavailable to either McCann or Shabazz due to the amendment to OP 866.1.

### 3. Unavailability Due to Defendant's Thwarting

Plaintiffs next assert that the grievance process was unavailable to Plaintiffs McCann, Shabazz, Courtney, and Hajacos because Defendant thwarted their ability to use the grievance process in three (3) ways. (Pls.' Opp'n at 40–43.) First, Plaintiffs argue that the VDOC prevented them from grieving effective communication issues because

18

the VDOC told McCann and Shabazz that their grievances related to JPay tablets and commissary issues were beyond the VDOC's control. (*Id.* at 41.) Plaintiffs misconstrue McCann's grievances. McCann's JPay grievance related to the kiosks being "off-line." (Pls.' Opp'n Ex. 96 at 2, ECF No. 235-96; Pls.' Opp'n Ex. 97 at 2, ECF No. 235-97.) The response indicates that the issue was beyond the VDOC's control and that a contractor would be visiting to repair the problem. (*Id.*; Pls.' Opp'n Ex. 98 at 2, ECF No. 235-98; Pls.' Opp'n Ex. 99 at 2, ECF No. 235-99.) McCann's grievance related to the commissary stated that the VDOC failed to provide the required 30-day notice to inmates prior to raising commissary prices. (Pls.' Opp'n Ex. 100 at 2, ECF No. 237-41.) The VDOC stated in its response that the issue was beyond its control and that it approved the vendor's price changes. (*Id.*; Pls.' Opp'n Ex. 101 at 2, ECF No. 237-42; Pls.' Opp'n Ex. 102 at 2, ECF No. 237-43.) Neither of these grievances involve ineffective communication. Accordingly, there is no evidence that McCann's effort to grieve a lack of communication or accommodations for his blindness was thwarted by Defendant.

Shabazz's grievance, on the other hand, was directly related to his blindness. He stated that the JPay tablets were inaccessible and requested that a "TalkBack App" be installed on his tablet so that he could navigate it independently. (Pls.' Opp'n Ex. 50 at 2.) The VDOC initially responded that his claim was "[n]on-[g]rievable" because it was "[b]eyond the control of the Department of Corrections." (*Id.* at 3.) When Shabazz appealed, the decision was affirmed because he did not submit the required supporting documents with his initial complaint. (Pls.' Opp'n Ex. 51 at 4; Suppl. DeBerry Decl. at Enclosure C.) The discrepancy between the initial reason given for the denial of his

19

grievance and the reason given on appeal is sufficient to create a dispute of fact as to whether the VDOC thwarted Shabazz's ability to grieve issues related to his disability.

Next, Plaintiffs contend that the VDOC told Shabazz, Courtney, and Hajacos that they should wait for their grievances to be resolved, causing them "to forfeit their right to fully exhaust their claims." (Pls.' Opp'n at 42.) In 2018, Shabazz completed a request form asking for JAWS software to be installed on the library computers. (Pls.' Opp'n Ex. 104 at 2.) The VDOC responded that the equipment was present, but that staff required training before Shabazz would be able to access it. (*Id.*) Over a year later, Shabazz followed up with another request about the JAWS software and he was told that "[t]he order has been sent to appropriate staff for processing" and that the VDOC would "advise once the software is here." (Pls.' Opp'n Ex. 105 at 2.)

Similarly, Courtney filed a facility request in 2022, asking that the windows in his cell be tinted. (Pls.' Opp'n Ex. 106 at 2, ECF No. 237-47.) He was told that he would be advised about the VDOC's response to the request once medical had confirmed that the window tinting was necessary. (*Id.*) Courtney also states that he was told verbally that his windows would be tinted but that he never received the accommodation before he was released from prison in 2023. (Courtney Dep. at 173:21–174:10, 159:5–9.)

When Hajacos requested accommodations for his JPay tablet in 2022, he was told that his request was forwarded to a doctor, the VDOC would respond to his request when it heard back from the doctor, and he was asked to "[b]e patient please." (Pls.' Opp'n Ex. 15 at 2, ECF No. 235-15.) Despite Hajacos following up, it took the VDOC over ten (10) months to deny his request. (Pls.' Opp'n Ex. 87 at 2, ECF No. 235-87; Pls.' Opp'n

Ex. 108 at 2, ECF No. 235-108.)  Based on the facts before the Court, in each of these situations, Plaintiffs were either told to wait or, worse, informed that their request would be granted only for it to be forgotten.  This evidence creates a question of fact as to whether the VDOC's actions were severe enough to constitute thwarting Shabazz's, Courtney's, and Hajacos' claims.

Finally, Plaintiffs assert that the VDOC often rejects grievances and asks Plaintiffs to produce overly burdensome information. (Pls.' Opp'n at 43.)  Plaintiffs provide two (2) examples of this: (1) Shabazz was asked to explain why he needed the JAWS software in the law library, and (2) Hajacos was asked to explain when and how he learned that his vision status was not in the prison's electronic database.  (*Id.*)  Neither instance is severe enough to effectively render the grievance process unavailable.

### 4.  Improper Narrowing of the Scope of Exhausted Claims

Plaintiffs' argument that Defendant is improperly narrowing the scope of Plaintiffs' exhausted claims is unavailing.  A plaintiff exhausting some of his claims is not enough to render his other claims exhausted.  *See Moore*, 517 F.3d at 725–30 (examining each of the plaintiff's claims separately to determine whether each had been exhausted); *Green v. Rubenstein*, 644 F. Supp. 2d 723, 743 (S.D. W. Va. 2009) ("If an inmate exhausts administrative remedies with respect to some, but not all, of the claims he raises . . . the Court must dismiss the unexhausted claims and proceed with the exhausted ones." (citing *Bock*, 549 U.S. at 201)).

Plaintiffs argue that vicarious exhaustion applies in this case because Plaintiffs were "similarly affected by Defendant[']s actions or inactions." (Pls.' Opp'n at 45.)

21

Plaintiffs cite *Jarboe v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. ELH-12-572, 2013 WL 1010357, (D. Md. Mar. 13, 2013), in support of this proposition. However, *Jarboe* is a class action case and vicarious exhaustion is typically limited to class actions. *See Mathis v. GEO Grp., Inc.*, No. 2:08-CT-21-D, 2011 WL 2899135, at *5 n.4 (E.D.N.C. July 18, 2011) (defining "vicarious exhaustion" as "when one or more *class members* ha[s] exhausted his administrative remedies with respect to each claim raised by the *class*" (emphasis added) (alteration in original) (internal quotations and citations omitted)). Plaintiffs have made no showing that their claims are so substantially similar that vicarious exhaustion would be appropriate in a non-class suit. Accordingly, the doctrine of vicarious exhaustion is inapplicable.

Plaintiffs also assert that Hajacos has exhausted his claims regarding prisoners reading and writing for him and that Shabazz has exhausted his claims relating to use of the SARA machine. (Pls.' Opp'n at 44.) Because both Hajacos and Shabazz exhausted claims related to these issues at least once, Plaintiffs assert that they provided "fair notice" to the VDOC of the issues. (*Id.* at 44–45.) The primary goal of the exhaustion requirement is to ensure prisons are put on notice and given an opportunity to resolve grievances prior to a lawsuit. *Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017) ("The main purpose of the PLRA's exhaustion requirement is 'allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record.'" (quoting *Moore*, 517 F.3d at 726)). However, this does not absolve inmates from exhausting their

22

administrative remedies prior to bringing a claim. *See Porter*, 534 U.S. at 532 ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes . . . .").

Here, it is unclear whether Hajacos exhausted his claim that he is forced to ask other prisoners to read and write for him. Plaintiffs point to a Regular Grievance that the VDOC accepted on December 6, 2022, where Hajacos grieved his lack of access to large print versions of various forms. (Pls.' Opp'n Ex. 112 at 5, ECF No. 237-52.) This Regular Grievance is not recorded in Hajacos' grievance report, and it is unclear if Hajacos appealed the Regular Grievance. (*See* Phillips Decl. at Enclosure C.) Whether Hajacos formally exhausted his claim on this issue is a factual question properly reserved for the jury. If his claim about large print forms is properly exhausted, the VDOC could infer that he would need to ask for assistance to read and complete standard print forms. Accordingly, Hajacos' claims about other prisoners reading and writing on his behalf appear to be properly encompassed by his grievance regarding large print documents.

Shabazz's exhausted grievance about the SARA machine involved an instance of a VDOC employee improperly denying Shabazz access to the SARA machine on a weekend. (DeBerry Decl. ¶ 25.) However, this grievance did not address the overall availability of the SARA machine, nor did it mention that requiring written requests to use the SARA machine was burdensome. (*Id.* ¶¶ 25–26.) Thus, Shabazz's grievance was not enough to put the VDOC on notice about these issues.

## B. Statute of Limitations

Defendant argues that some or all of Hajacos', Shabazz's, and Shaw's claims are barred by the statute of limitations. (Def.'s Mem. in Supp. at 50–54.) The parties disagree as to the applicable statute of limitations. Defendant asserts that both the ADA and the RA are subject to a one-year statute of limitations. (Def.'s Mem. in Supp. at 43.) Plaintiffs contend that, because of the ADA Amendments Act of 2008 (the "ADAAA"), which amended both the ADA and the RA, a four-year statute of limitations applies to their claims. (Pls.' Opp'n at 46.)

Because neither the ADA nor the RA contain an express statute of limitations, the Court must "borrow the state statute of limitations that applies to the most analogous state-law claim." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011); *see also Wolsky v. Med. Coll. of Hampton Roads*, 1 F.3d 222, 223 (4th Cir. 1993). Further, courts should "apply the same substantive analysis to both the ADA and the [RA] '[b]ecause the language of the two statutes is substantially the same.'" *A Soc'y Without A Name*, 655 F.3d at 347 (quoting *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995)) (second alteration in original). The Fourth Circuit has previously held that, due to the similarities between the statutes, the one-year statute of limitations in the Virginia Disabilities Act ("VDA") applies to both ADA and RA claims. *Id.* at 348.

However, Congress enacted 28 U.S.C. § 1658, a catchall provision which establishes a four-year statute of limitations for all federal statutes enacted after December 1, 1990. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004). "[I]f

24

[a] plaintiff's claim against [a] defendant was made possible by a post-1990 enactment," the cause of action "'aris[es] under an Act of Congress enacted' after December 1, 1990." *Id.* at 382 (last alternation in original). Here, Plaintiffs bear the burden of demonstrating that their claim was made possible by a post-1990 amendment. *Mills v. Hogan*, No. 22-6421, 2022 WL 17985697, at *1 (4th Cir. Dec. 29, 2022).

Though the ADA and the RA were enacted before December 1, 1990, the ADAAA was enacted in 2008 and is covered by the catchall provision in § 1658. The question before the Court is whether Plaintiffs' claims were "made possible" by the ADAAA or whether Plaintiffs could have brought their claims prior to the ADAAA's enactment.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(1)(A). However, the prior version of the ADA did not provide any further details on how the term should be construed. *See* Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 12102, 104 Stat. 327, 329–30 (1990) (amended 2008). The amendment provides the following specifications when construing the definition of "disability:"

> (E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—
>
> > (I) . . . low-vision devices (which do not include ordinary eyeglasses or contact lenses) . . . ;
> >
> > (II) use of assistive technology; [and]
> >
> > (III) reasonable accommodations or auxiliary aids or services . . . .

42 U.S.C. § 12102(4)(E)(i).  This addition essentially reversed the United States Supreme Court's holding that courts could take all mitigating measures into account when determining whether an individual was disabled.  *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999); *Young v. United Parcel Serv., Inc.*, 784 F.3d 192, 199 n.9 (4th Cir. 2015), *vacated and remanded on other grounds*, 575 U.S. 206, 631 (2015) ("[T]he ADAAA effectively overruled the interpretation offered in [*Sutton*].").

Plaintiffs contend that, because they use low-vision devices and auxiliary aids to help them see, they were not considered disabled under the ADA prior to the ADAAA amendments. (Pls.' Opp'n at 46.)  However, Plaintiffs do not meet their burden of demonstrating that their claims were only made possible by the ADAAA.  Prior to the enactment of the ADAAA, the Fourth Circuit signaled that blindness is a physical limitation that generally qualifies as a disability.  *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 166 n.5 (4th Cir. 1997) (en banc), *abrogated on other grounds by Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (finding that "blindness and deafness are physical conditions that always substantially limit the major life activities of blind and deaf individuals").  There is no dispute that Plaintiffs Hajacos, Shabazz, and Shaw are legally blind.  Further, all three (3) suffer from forms of blindness that cannot be substantially improved by using glasses or contacts. (Pls.' Ex. 5 at 1, ECF No. 194-2; Pls.' Ex. 9 at 2–4, ECF No. 194-4; Pls.' Ex. 12 at 5–6, ECF No. 194-5.)  Hajacos requires strong magnifiers to read, and Shabazz and Shaw use assistive devices to read, such as a SARA machine. (Hajacos Dep. at 37:22–38:22; Shabazz Dep. 21:7–9; Shaw Dep. 53:4–12.)  Because their blindness is severe, they would have been able to bring their claims

under the prior version of the ADA. *See Fletcher v. La. Dep't of Transp. and Dev.*, 848

F. App'x 163, 164 (5th Cir. 2021) (finding that the § 1658 catchall statute of limitations

did not apply because "EEOC regulations and caselaw recognized that [the plaintiff's

impairment], if severe enough, could have qualified as a disability under the original

ADA"). Because Plaintiffs' claims were not "made possible" by the ADAAA, the one-

year statute of limitations found in the VDA applies.

Plaintiffs argue that, even if the one-year statute of limitations applies, their claims

survive because they involve continuing violations. (Pls.' Opp'n at 46–47.) In order to

establish a continuing violation, a "plaintiff [must] show that the illegal act did not occur

just once, but rather in a series of separate acts. . . ." *A Soc'y Without A Name*, 655 F.3d

at 348. If a plaintiff can make this showing, then each violation restarts the clock on the

statute of limitations. *Id.* However, "continual unlawful acts are distinguishable from the

continuing ill effects of an original violation because the latter do not constitute a

continuing violation." *Id.*

Defendant contends that Shaw's claims should be dismissed because they center

around him being unable to attend a computer class over two (2) and a half years ago,

being unable to obtain employment since 2007, and injuring his head from hitting it on a

top bunk four (4) years ago. (Def.'s Mem. in Supp. at 54.) Plaintiffs do not dispute this

and, instead, argue that a continuing violation exists because "Plaintiffs repeatedly have

asked [the] VDOC to live up to its ADA obligation to ensure effective communication by

providing assistive technology." (Pls.' Opp'n at 47.) They also assert that Shaw's

ongoing ineligibility for work constitutes a continuing violation. (*Id.* at 47–48.)

Plaintiffs provide no evidence of continuing violations for any of Shaw's claims. Shaw has not attempted to attend another class since the computer class over two (2) years ago and has failed to inquire about or apply for any jobs since 2007. Likewise, his head injury in the Veterans dorm happened over four (4) years ago. These incidents occurred well beyond the one-year statute of limitations, and there is no indication that there was a series of separate acts. Shaw's remaining claim is that he hit his head on his bunk in November 2023 and sustained a nose bleed. This alone is not enough to support an ADA claim. Accordingly, Shaw's claims will be dismissed.

Defendant likewise argued that Hajacos' claim regarding his termination from his Wood Shop job is beyond the statute of limitations because he was terminated in 2021. (Def.'s Mem. in Supp. at 50.) Again, Plaintiffs point to no evidence of a continuing violation. Thus, Hajacos' claim related to his Wood Shop termination will be dismissed.

Plaintiffs frame Shabazz's employment claim as arguing that VDOC restrictions prevented him from obtaining a job. (Pls.' Opp'n at 47–48.) Shabazz's inability to obtain a Grade 3 job is unique in this respect: he continued to apply for positions throughout the years. Though he completed his initial applications for Grade 3 positions around 2017 or 2018, he applied for a Grade 3 pod clerk position in 2022. (Shabazz Decl. at 50:24–51:20.) Defendant states that there is no "pod clerk" position, rendering his 2022 application moot. (Def.'s Mem. in Supp. at 53.) Plaintiffs contend that this is a meaningless distinction because there is a "pod tutor" job and Shabazz applied for that position in 2023. (Pls.' Opp'n at 50; Pls.' Opp'n Ex. 69 at 2, ECF No. 235-69.) The

dueling interpretations of Shabazz's application create a question of fact as to whether his application to the pod clerk position is sufficient to constitute a continuing violation.

Defendant also asserts that Shabazz's claim about other prisoners reading and writing on his behalf should be dismissed because it accrued in 2019 when he exhausted his grievances related to it. (Def.'s Mem. in Supp. at 52.) However, it appears from the record that Shabazz still asks other prisoners to read and write for him. (Shabazz Decl. at 9:15–10:24, 13:2–18.) Because there is a factual question as to whether Shabazz continued to require assistance from other prisoners after he exhausted his grievance, Defendant's motion for summary judgment will be denied as to this claim.

### C. Meritless Claims

Defendant argues that Hajacos', Shabazz's, and McCann's claims should be dismissed because there is no genuine dispute of material fact. (Def.'s Mem. in Supp. at 50–53, 57–58.) In order to establish a violation of the ADA, "plaintiffs must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) (citation omitted). The Fourth Circuit has held that, because the ADA and the RA are substantially the same, the same analysis applies to both statutes. *Spencer v. Earley*, 278 F. App'x 254, 261 (4th Cir. 2008) (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999)). The one difference that courts must consider between the statutes is that the RA requires a plaintiff to show that "he was excluded 'solely by reason of' his disability" whereas "the

ADA requires only that the disability was 'a motivating cause' of the exclusion."

*Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (quoting *Halpern*

*v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461–62 (4th Cir. 2012)).

A plaintiff may pursue three (3) distinct grounds for relief under the ADA:

"(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure

to make reasonable accommodations." *A Helping Hand, LLC v. Baltimore Cnty.*, 515

F.3d 356, 362 (4th Cir. 2008) (citations omitted). Here, Plaintiffs bring their claims

under the third ground. (Pls.' Mem. in Supp. at 19.) Courts must consider the context of

the case and, when that context is a prison, the reasonableness of accommodations should

be viewed "through the lens of operating a prison." *Richardson v. Clarke*, 52 F.4th 614,

621 (4th Cir. 2022) (citations omitted).

Defendant first argues that Hajacos' claims related to the termination of his Wood

Shop job and his computer class are unfounded. (*Id.* at 51–52.) Hajacos' Wood Shop

claim will be dismissed because it is beyond the statute of limitations. *See supra* § III.B.

This leaves his computer class claim. There is conflicting testimony about whether

Hajacos was provided accommodations in his computer class. Defendant asserts that

Hajacos received reasonable accommodations in his computer class, including an

accessible textbook, screen reader software, and magnifying glasses, among other things.

(Zormelo Decl. ¶ 8, ECF No. 210-27.) His instructor, F. Zormelo ("Zormelo") and an

inmate aide who could interpret sign language were also available to assist Hajacos with

reading and writing in the class. (*Id.* ¶¶ 9–10.) Hajacos paints a very different picture.

He states that he was never provided a screen reader, that Zormelo refused to assist him,

and that the inmate aide did not know enough sign language to effectively communicate with him. (Suppl. Hajacos Decl. ¶¶ 15–16.)

However, this factual dispute is ultimately irrelevant because Hajacos admits that he was provided adequate accommodations for the class. In a "Letter of Appreciation" written to Zormelo, Hajacos stated that "[h]aving access to the right materials and tools [] truly aid[ed] in my success in this class." (Zormelo Decl. at Enclosure C.) He also stated that "[t]hanks to all of you, I now have more confidence in myself, because I have the ability to read and comprehend what I am studying" and that "[t]his class is a delight to be a part of." (Id.) Further, Hajacos admitted in his deposition that he was able to read the textbook for the computer class. (Hajacos Dep. at 30:19–33:13.) Based on these admissions, no reasonable juror could find that Hajacos was denied reasonable accommodations in his computer class, and this claim will be dismissed.

Defendant next contends that Shabazz's claim about being denied a Grade 3 work assignment is not supported by the record. (Def.'s Mem. in Supp. at 53.) Because Shabazz currently works in the laundry department, Defendant asserts that Deerfield does not categorically prohibit Shabazz from obtaining a job. (Id.) Defendant also notes that job placement is based on availability. (Id.) Finally, Defendant argues that Shabazz's application for the "pod clerk" position is meritless because no such job exists.[9] (Id.)

Plaintiffs do not dispute the fact that Shabazz currently works in the laundry department or that job placement is based on availability. Instead, they assert that

_____

[9] The Court previously addressed this argument. See supra § III.B.

31

Shabazz has applied for multiple Grade 3 jobs and each application was denied because he was blind. (Pls.' Opp'n at 50; Pls.' Opp'n Ex. 69 at 2; Pls.' Opp'n Ex. 70 at 2, ECF No. 235-70.) Thus, there is a genuine dispute about whether Shabazz was denied Grade 3 work assignments because of his blindness.

Finally, Defendant argues that McCann has received adequate accommodations for his disabilities. (Def.'s Mem. in Supp. at 57–58.) However, McCann's claims are rife with factual disputes. For example, though the VDOC provided textured tape to help McCann navigate his housing unit, McCann states that the tape is regularly removed and that the VDOC sometimes takes weeks to replace it. (McCann Dep. at 60:21–62:4.) Similarly, though the VDOC states that it moved McCann's Caregiver to accommodate him, McCann states that his Caregiver was only moved because the inmate next to McCann wanted to switch beds. (*Id.* at 37:9–38:22.) It would be inappropriate for the Court to rule on McCann's claims at the summary judgment stage because it would require the Court to weigh evidence. Accordingly, Defendant's request for summary judgment as to McCann's claims will be denied.

## IV. PLAINTIFFS' MOTION

### A. Genuine Disputes of Material Fact

Plaintiffs' Motion can be boiled down to two (2) primary arguments: (1) the VDOC library computers are not accessible to blind inmates, nor are blind inmates provided adequate access to SARA machines in the libraries; and (2) the tablets and kiosks provided for prisoner use by the VDOC are not accessible. (Pls.' Mem. in Supp.

at 21–27.)  Because of these failings, Plaintiffs assert that they are denied equal access to effective communication by the VDOC.  (*Id.* at 27–29.)

Plaintiffs contend that the libraries at both Greensville and Deerfield do not provide adequate assistive technology to enable blind prisoners to utilize them.  (*Id.* at 21–24.)  Plaintiffs state that there is only one SARA machine in the Deerfield law library and no SARA machine at Greensville.  (*Id.* at 23–24.)  Likewise, Plaintiffs state that the library computers are not equipped with screen reading software and VDOC staff are not available to assist blind inmates in the libraries.  (*Id.* at 21–22.)  Plaintiffs also assert that VDOC staff do not receive adequate training on assistive technology.  (*Id.* at 26–27.)  Plaintiffs argue that the lack of accommodations in the libraries denies blind prisoners "equally effective communications in their library programs."  (*Id.* at 23.)

Defendant asserts that the VDOC already provides reasonable accommodations in its libraries.  (Def.'s Resp. in Opp'n at 23–24.)  Librarians are available at both the Deerfield and Greensville law libraries to assist blind inmates with locating and printing case law.  (Phillips Dep. at 96:12–14, 83:7–17; Delbridge Dep. at 22:8–19, ECF No. 216-2.)  The Deerfield law library has a SARA machine that reads aloud documents to blind inmates and the computers at the Greensville library have both a narrator and a magnification function.  (Def.'s SUF ¶ 153; Phillips Dep. at 94:15–20, 127:2–8.)  The Deerfield education library has both large print books and audiobooks available in its collection.  (Geist Dep. at 51:7–8, 120:22–121:8, 128:7–22, ECF No. 210-17.)  Additionally, the Greensville education librarian testifies that a blind inmate has never requested assistance or accessible services.  (Shumate Decl. ¶ 12, ECF No. 210-29.)

33

These facts, among others, create a genuine dispute as to whether the libraries at Deerfield and Greensville are accessible to blind inmates. Accordingly, Plaintiffs' request for summary judgment as to the libraries will be denied.

Plaintiffs next assert that the JPay tablets and kiosks are not accessible. (Pls.' Mem. in Supp. at 24–26.) Plaintiffs assert that, because the tablet screens are smooth, blind inmates are unable to navigate them. (*Id.* at 25.) The kiosk keyboards are also smooth, making it difficult to type. (*Id.*) Though Deerfield has a Braille keyboard for its kiosk, Plaintiffs assert that they have no way of knowing what they typed because the kiosk does not have screen reader software. (*Id.*) For partially blind inmates, reading information on the screen is difficult because it is so small, and inmates are required to pay for tablets with larger screens. (*Id.*) Finally, Plaintiffs assert that the tablets and kiosks are not equipped with assistive technology, such as text-to-speech software or magnification capabilities. (*Id.* at 25–26.) Plaintiffs contend that these factors, combined with the fact that the JPay tablets are the only way prisoners can send emails, render Plaintiffs "unable to privately and independently communicate with friends and family like sighted prisoners can." (*Id.* at 24.)

Defendant first argues that there is a dispute of fact as to whether the tablets and kiosks are inaccessible. (Def.'s Mem. in Supp. at 18–19.) Defendant presents evidence that the JPay tablets contain a zoom and magnification feature, as well as a "talk back" feature. (Welch Decl. ¶¶ 9–10, ECF No. 210-33.) Additionally, Defendant provides testimony that many of the JPay kiosks have Braille keyboards and that inmates may purchase Braille keyboards for their tablets. (*Id.* ¶ 11.) Defendant also asserts that it

provides alternative means for blind inmates to effectively communicate with friends and family, including in-person visits and telephones, among other things. (Def.'s Mem. in Supp. at 19–20.) Based on Defendant's evidence, the Court finds that there is a material dispute of fact about the accessibility of the JPay tablets. Thus, Plaintiffs' request for summary judgment as to the JPay tablets will be denied.

### B. Prison Litigation Reform Act Exhaustion

Defendant asserts that Plaintiffs' Motion should be denied because Plaintiffs failed to exhaust their claims as required by the PLRA. (Def.'s Resp. in Opp'n at 16–18, ECF No. 219.) Most of the parties' arguments related to exhaustion are addressed in detail in the Court's analysis of Defendant's exhaustion argument in its Motion. *See supra* § III.A. However, Plaintiffs raise a unique defense to exhaustion in their Reply. (ECF No. 239.) Though the Court will deny Plaintiffs' Motion on the merits, the Court also addresses Plaintiffs' additional exhaustion defense below.

Plaintiffs argue that, because the NFBVA has associational standing, it is not bound by the PLRA's exhaustion requirements. (Pls.' Reply at 12–13.) Thus, it is not required to exhaust its claims regarding the denial of effective communication. (*Id.*) Plaintiffs rely on *Dunn v. Dunn*, 219 F. Supp. 3d 1163 (M.D. Ala. 2016), where the Middle District Court of Alabama held that the PLRA's exhaustion requirement does not apply to state protection and advocacy organizations because they are not "prisoners." *Id.* at 1176. The Fourth Circuit has yet to opine on whether associational plaintiffs must demonstrate exhaustion under the PLRA.

There are substantial differences between the case at hand and *Dunn*. First, the claims in *Dunn* were brought under The Protection and Advocacy for Individuals with Mental Illness Act, which allows state protection and advocacy organizations "to bring litigation to address systemic problems in the treatment of people with mental illness." *Id.* at 1166. The court's holding was based in part on its reasoning that "it would conflict with [the state protection and advocacy organization's] statutory purpose and the associational standing doctrine . . . to allow [the organization] to bring claims only on behalf of prisoners who had themselves exhausted an administrative grievance process . . . ." *Id.* at 1176. The claims in this case are brought under the ADA, which requires an individual analysis of the circumstances of each Plaintiff to determine if ADA requirements are met. *See Lamone*, 813 F.3d at 508 ("Determination of the reasonableness of a proposed modification is generally fact-specific." (citation omitted)). Further, the NFBVA is a private organization, not a state protection and advocacy organization. The statutory considerations present in *Dunn* are not present here.

Additionally, the state protection and advocacy organization in *Dunn* sent a detailed demand letter, outlining what needed to be corrected in the prison. *Dunn*, 219 F. Supp. 3d at 1174–75. There is no evidence that the NFBVA ever sent a letter, or equivalent communication, to the VDOC describing the issues in Greensville and Deerfield and requesting relief. Thus, unlike in *Dunn*, it is not clear that the NFBVA ever provided the VDOC with notice and an opportunity to resolve the issues that it now seeks judgment on.

36

Conversely, Defendant relies on a Second Circuit case, *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67 (2d Cir. 2021), where the Second Circuit found that a private organization suing on behalf of prisoners was still bound by the PLRA exhaustion requirements. *Id.* at 82–83. In *Green Haven*, the associational plaintiff was a Quaker group and its membership consisted exclusively of inmates. *Id.* at 73–74. The Second Circuit held that "the [i]ncarcerated [p]laintiffs [could not] avoid the exhaustion requirement by suing under the banner of Green Haven Meeting, of which they are members." *Id.* at 82.

The Court finds that the principles in *Green Haven* are more applicable to this case. PLRA exhaustion is mandatory and applies to every suit that involves inmates. *See Bock*, 549 U.S. at 211. This Court is hesitant to set a precedent that would allow inmates to circumvent the PLRA's strict requirements simply by bringing suit through an association. Thus, in order to succeed on its claims, the NFBVA must show that each claim was exhausted pursuant to the PLRA.

## V. CONCLUSION

For the reasons stated herein, Defendant's Motion will be granted in part and denied in part and Plaintiffs' Motion will be denied.

An appropriate Order will accompany this Memorandum Opinion.

_____ /s/

Henry E. Hudson
Senior United States District Judge

Date: May 8, 2024
Richmond, Virginia

37